CHRISTOPHER J. PRENAVEAU *VS.* SARAH R. PRENAVEAU.

No. 09-P-950.

Norfolk. June 15, 2009. - August 28, 2009.

Present: CYPHER, McHUGH, & MILKEY, JJ.

*Divorce and Separation,* Child custody, Findings, Division of property. *Parent and Child,* Custody. *Minor,* Custody. *Practice, Civil,* Findings by judge.

A probate judge, in determining custody issues in a divorce action, erred in allowing the husband to remove the parties' children from Massachusetts to New Hampshire, where the judge inadequately examined the impact of the relocation on the children, allowed them to be uprooted without identifying any distinct advantages that relocation would bring to them, failed to assess reasonably available alternative arrangements, and failed to consider whether a shared custody arrangement of the type he envisioned would actually work for the parents or the children; therefore, this court vacated the custody ruling and remanded the matter to the probate court for careful re-examination of the facts and available options by the trial judge, with further fact finding as necessary. [138-144] McHUGH, J., dissenting.

Discussion of factual issues likely to arise on remand of a custody dispute to the probate court. [144-147]

This court remanded a divorce matter to the probate court for further findings regarding issues involving the division of marital assets for which the judge failed to provide an adequate explanation of his reasoning. [147-150]

COMPLAINT for divorce filed in the Norfolk Division of the Probate and Family Court Department on March 3, 2006.

The case was heard by *Robert W. Langlois,* J.

*Robert J. DiLibero* for Sara R. Prenaveau.

*Donald J. Kaiser* for Christopher J. Prenaveau.

MILKEY, J. This expedited appeal is from a Probate and Family Court judgment of divorce nisi. The dispute is primarily about where the couple's children will live. While married, the couple lived in Stoughton, where the wife still lives. In 2007, while divorce proceedings were pending, the husband moved to central New Hampshire, where he now lives with the couple's former au pair.

After trial, the Probate Court judge declined to determine that either parent should have sole physical custody of their young children. He nevertheless allowed the husband to remove the children to New Hampshire. The wife was allowed to have the children much of the time if she bore the transportation burdens and effectively maintained a part-time residence in New Hampshire. Although the judge refused to put a label on this custody arrangement, he explained that he ordered it so that the children would have roughly equal time with their parents. On appeal, the wife challenges the judge's resolution of the custody and removal issues, as well as his division of the marital estate. Because we conclude that the judge misapplied the law and allowed the children to be removed without any showing that the move would provide a distinct advantage to them, and failed to provide an adequate explanation of his division of the marital estate, we reverse those portions of the judgment that address custody, removal, child support, and property division.

*Background.*[1] The husband and wife met in college when he was a senior and she was a freshman. After the husband graduated in 1995, he worked at Walmart for a year and then began employment at PM Associates, Inc., a small firm based in Stoughton that was owned and run by his future father-in-law, Peter Miller. The company performs bookkeeping services for other businesses that want to "outsource" that work. After the wife graduated in May of 1998, she briefly worked for an accounting firm and then also joined her father's business. The couple was married in August of 1998, and they established a home in Stoughton.

Over time, the husband's and wife's careers at PM Associates took distinctly different trajectories. By 2005, the last year they both worked for the company, the wife was working extremely long hours (often 9:00 AM to 9:00 PM), she had acquired a forty percent interest in the company, she was earning a taxable annual income of $122,989, and — at least for some purposes — she was held out as president of the company.[2] The husband's

---

[1]The facts are drawn from the judge's findings, "supplemented by the record where necessary." *A.Z.* v. *B.Z.*, 431 Mass. 150, 151 (2000).

[2]Despite her occasional use of the title "President," there seems little doubt that her father continued to run the company.

taxable income at that time was $63,600, he worked more sporadic hours, and his functions involved setting up the computer system and occasional marketing. In his words, "I basically just became a runner, and I still did some sales."

The wife gave birth to a daughter on August 29, 2003, and to a son on April 24, 2005. Both parents continued to work their respective schedules, and the day-to-day "grunt work" of parenting was performed by au pairs. The husband's lighter and more flexible workload allowed him to see more of the children during the day. The differential in their time spent with the children was not as great as their different work schedules might suggest, however, because the father regularly left the children with the wife's parents in the evenings, and he spent many weekends apart from his family pursuing outdoor activities such as hunting, fishing and snowmobiling. As a result, prior to the separation the husband spent only "slightly more time with the children."

The couple's daughter was born with a serious condition relating to a blockage in her intestines. She required surgery immediately after her birth and spent two weeks in the hospital (with the husband and wife taking shifts to be with her). In May of 2006, the daughter became ill, was admitted to a Boston hospital, underwent major surgery, and spent a total of two weeks in the hospital. In 2007, she was again hospitalized in Boston, although no additional surgery was required. As the judge found, the daughter is currently healthy but she needs to be watched for a possible recurrence of her serious gastrointestinal problems.

The couple's relationship became increasingly strained as their career paths at PM Associates diverged. The record is replete with many poignant examples of the uncomfortable interplay between their work and personal spheres. The conflict in the marriage increased by the fall of 2005 when the husband "began to spend an inordinate amount of time" with their au pair, Candaliza Vasquez.

The husband filed for divorce on March 13, 2006. After promptly being fired from his position at PM Associates, he began working as a boat salesman. Nevertheless, the couple continued to live in the same home in Stoughton, apparently still with Ms. Vasquez. The parents shared legal and physical

custody of their children pursuant to a temporary court order issued on April 21, 2006.

After a few months, it became plain that their living situation was untenable, and the husband and Ms. Vasquez moved to a house in the adjacent town of Canton. Under a modified court order issued on July 13, 2006, the parents continued to share legal and physical custody. This was accomplished through a somewhat complicated schedule that had the children spending about two-thirds of their time with the wife, and one-third of their time with the husband. As of May 11, 2007, the husband was required to pay $100 per week in child support.

With the break up of her marriage, the wife hired a new au pair to replace Ms. Vasquez. She also cut back on the amount that she worked, which allowed her to spend more time with her children. Immediately after the separation, she worked twenty to twenty-five hours per week, and by the end of trial (three years later), she was working approximately thirty hours per week. By the time of trial, the daughter was in full-day kindergarten in Stoughton and the son was in a part-time preschool two days per week.

Even before the breakdown of the marriage, the husband began to consider a change in career. He had long served as a "special police officer" in Stoughton, and he decided to pursue law enforcement full time. He also considered moving back to New Hampshire where he grew up, where he pursued his avid love of outdoor activities, and where he still had extended family. In October or November of 2005, several months before he filed for divorce, he applied to be a New Hampshire State trooper. He was eventually accepted into the program, and after deferring his admission, he moved to New Hampshire in August of 2007 to begin a 14-week training at the State police academy. Given this change in circumstances, on August 3, 2007, a different Probate Court judge modified the temporary custody order and gave the wife sole physical custody, while allowing the husband to see the children for three or four weekends per month.[3] That order, which also increased the child support the husband was required to pay to $157 per week, remained in effect until April of 2009.

---

[3]For months that included four weekends, the husband had the children for three weekends. For months that included five weekends, the wife and husband alternated the extra weekend. The parents continued to share legal custody.

The father was assigned to the "Troop A Barracks," one of six barracks covering the state. This barracks includes two "patrol areas": Rockingham County, which abuts the Massachusetts border, and Strafford County, which lies further to the north. The husband testified that he was able to bid on shifts in both patrol areas, and he specifically put in to work the "midnight shift," which runs from 10:00 P.M. to 6:00 A.M. He eventually was assigned to the Strafford County patrol area, although the record is actually silent on whether this was by choice or as a result of colleagues with greater seniority outbidding him on any available openings in Rockingham County. Whatever the explanation, once he was assigned to the Strafford County patrol area, he was required to live there, and he eventually chose to live in Gonic, a small town outside of Rochester, New Hampshire.

The husband's move and the attendant modification in custody required extensive shuttling of the children back and forth between Stoughton and Gonic. In driving distance, Gonic is less than 100 miles from Stoughton, but the trip took between three and three and one-half hours each way, often longer if there was heavy traffic (such as trips north on Friday afternoons). It was uncontested that the trips were hard on the children, and the judge "fully concur[red]" with the wife's assessment that the then-current arrangement was "disruptive and taxing to the children [and] substantially interfere[d] with their ability to maintain strong peer relationships."

*The guardian ad litem's evaluation.* By order dated June 8, 2006, the court appointed the Children and the Law Program at Massachusetts General Hospital as the guardian ad litem (GAL) to review the matter and to produce a written report setting forth conclusions. Specifically fulfilling the role was Dr. David Shumaker, a practicing clinical psychologist who had served as a GAL on forty-five to fifty previous occasions. Dr. Shumaker conducted an extensive investigation that included home visits, and numerous interviews with both parents, their daughter, extended family members, and various other collaterals. To sum up his investigation and conclusions, he produced an extremely detailed and thoughtful report that totaled fifty-nine single-spaced pages.

The GAL report concluded that both parents had close, loving

relationships with their children. As stated in the report, "[b]oth children appear to be closely and positively bonded with both parents and historically both parents appear to have played active roles in decision-making and caring for these children within their limited roles as full-time, working parents." The report also concluded that both parents — in the abstract — wanted what was best for their children. Nevertheless, it observed that their personal relationship created "a daily co-parenting existence rife with animosity and distrust," and that both parents were often unable to put aside their differences to foster their children's best interest. The GAL report documented this conclusion with many specific examples.

In his report, Dr. Shumaker assiduously refused to "choose sides," and he plainly found that each party had at times acted inappropriately. In terms of recommendations, Dr. Shumaker concluded that the children would greatly benefit from regular, significant contact with both parents and that it would be harmful for either parent to "drop out" of their lives. His "main concern" was "the currently toxic and unhealthy co-parenting relationship that they are pursuing and the potential short- and long-term negative impact that these relations will have upon their children." He highlighted various ways that the parents could improve their co-parenting, such as using a parenting coordinator to help mediate their interactions.

It bears noting that Dr. Shumaker completed the report while the husband was still living in Canton. Although aware that the husband had applied to be a State trooper in New Hampshire, the GAL report stated that the husband was "somewhat vague when questioned about this prospect, stating words to the effect that the New Hampshire job is on hold and that he will do whatever it takes to remain an active presence in his children's lives." Therefore, the GAL report did not evaluate the ramifications of such a move on the children. Likewise, while the GAL report noted that the wife expressed suspicions that the husband was having an affair with Ms. Vasquez, the nature of that relationship had not been established at the time of the report.[4] The GAL report therefore did not examine how the actual relationship

---

[4]At trial, the husband admitted that he had a romantic relationship with Ms. Vasquez but claimed that the relationship did not begin until just before his

between the husband and the family au pair, Ms. Vasquez, affected his fitness as a parent, if at all.[5]

*The probate judge's ruling as to custody and removal.* As set forth above, when the husband moved to New Hampshire in August of 2007, the wife was given sole physical custody of the children under a temporary order. The husband had extensive weekend and summer visitation rights under that order, with the parents having to split the driving. A different judge presided over the trial, which included seven days of testimony stretched over eleven months.[6] During the proceedings, the judge expressed his view that the constant shuttling of the children between Stoughton and Gonic was "absurd."

Not surprisingly, when the trial judge entered the judgment nisi on April 15, 2009, he modified the existing arrangement. In his findings (and throughout the trial), the judge made it clear that he "eschew[ed]" the term "physical custody," and he did not otherwise employ the term in his ruling.[7] With regard to the relative time he allocated to each party, however, there is no doubt that he essentially reversed the terms set forth twenty months earlier in the August, 2007, temporary order. Under his order, the children would reside primarily with the husband, with

move to New Hampshire. The trial judge expressly rejected the credibility of this claim and found it more likely than not that the relationship had begun by the time he left the marital home. He also found that the husband and wife's relationship had become strained before Ms. Vasquez entered the picture.

[5]Further particulars regarding what the GAL report did and did not conclude are set forth below, as are the facts relevant to the division of the marital estate.

[6]The court heard from both parties, their three living parents, and the GAL. In addition, the court admitted into evidence a redacted transcript of a deposition of an additional witness (an occasional family baby-sitter) who had returned to her native Brazil.

[7]As we recently recognized, "custody judgments issued by the Commonwealth's courts do not consistently use these terms ['joint physical and legal custody'] as defined in G. L. c. 208, § 31." *Abbott* v. *Virusso*, 68 Mass. App. Ct. 326, 329 n.8 (2007), and cases cited. See *id.* at 329-330 n.9 (noting that "[t]erms such as legal and physical custody are eschewed by the [American Law Institute], which instead utilizes terminology descriptive of the various, discrete parenting responsibilities and functions, 'recogniz[ing] that different types of involvement in the child's life are relevant in different ways to the various allocation issues addressed by [this] chapter'"), quoting from American Law Institute's Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.03 comment g (2002).

the wife having visitation rights on designated weekends during the school year and various weeks during the summer. In fact, the mother was allowed visitation with the children on fewer weekends per month than the father had under the August, 2007, order. Moreover, the transportation responsibilities were placed principally on the wife instead of being shared.[8]

According to the judge, his custody plan sought to ensure that the children would "spend approximately the same amount of time with each parent." In effect, however, the judgment does not equalize the children's time with the parents. The wife will have the children for no more than eight to twelve nights per month for the non-summer months only if she is able to seize every opportunity provided by the order. However, significant obstacles have the potential to prevent her being able to see the children that often. Since the children will be attending school during the week, she will be able to have them on the Thursday and Sunday nights set out in the judgment only if she spends those nights in New Hampshire (either at a motel or at her parents' vacation house in Wakefield, one-half hour's drive from Gonic). If one assumes the wife has an ordinary five-day work week, then the order would provide her only four to six nights per month with the children.[9]

After the judge denied her motion for a stay, the wife filed an emergency petition for a stay in this court. Although he denied that request, the single justice converted the petition into a full appeal and expedited that appeal for a decision to issue prior to the commencement of the children's school year.

*Discussion.* 1. *Custody and Removal.* The custody issues in this case are bound up with the husband's request to remove the

---

[8]While the judge did not bar the mother from taking the children back to Massachusetts for visits, his order bespeaks a clear preference that she visit the children in New Hampshire close to their new permanent home.

[9]For reasons that are not immediately apparent, the judge viewed his resolution as a significant compromise between extreme positions proposed by the parties. Specifically, the judge said: "Each party presented various reasons in justification why he/she should be the principal caretaker for the children. In each instance, however, . . . the children would have been the losers in this pitched battle." Although we know that the husband, like the wife, was seeking full custody, his specific proposal for visitation was not included in the record. It is difficult to imagine how that proposal could be appreciably more favorable to him than the one ordered by the judge.

children from the Commonwealth. Pursuant to G. L. c. 208, § 30, minor children of divorced parents who have resided in the Commonwealth for five years or more cannot be removed from the Commonwealth (absent appropriate consent) except by court order "upon cause shown." "The words 'upon cause shown' mean only that removal must be in the best interests of the child." *Yannas* v. *Frondistou-Yannas*, 395 Mass. 704, 711 (1985) (*Yannas*), citing *Rubin* v. *Rubin*, 370 Mass. 857, 857 (1976). *Hale* v. *Hale*, 12 Mass. App. Ct. 812, 815 (1981). How the best interests of the children are to be measured, however, varies somewhat with the particular context presented. The parties vigorously debate which specific precedent applies, with the wife relying on *Yannas*, *supra*, and the husband relying on *Mason* v. *Coleman*, 447 Mass. 177 (2006) (*Mason*). We are initially called upon to decide which of the two cases applies.

*Yannas* and *Mason* have much in common. Both involved a parent (in each case the mother) who sought court approval to remove her children from the Commonwealth to a location that made co-parenting difficult or impossible. In laying out the legal principles that applied to the question of removal, the two cases do *not* articulate distinctly different tests. In each case, one question was preeminent: is removal in the best interests of the children? Moreover, the cases required that this ultimate question be answered through a case-specific factual analysis of how relocation would affect the welfare of the children.[10]

The main distinction between the analyses set forth in the two cases comes down to the weight that should be assigned to the benefits that relocation would provide the parent seeking to move. Where that parent has been given sole physical custody, then — as *Yannas* teaches — the interests of the children are "so interwoven with the well-being of the custodial parent," that a demonstration that the move provides him or her palpable benefits (a "real advantage") helps to justify the uprooting of the children. *Yannas*, *supra* at 710-711. See *Rosenthal* v. *Maney*, 51 Mass.

---

[10]See *Yannas*, *supra* at 712 ("The judicial safeguard of [the interests of the parents and children] lies in careful and clear fact-finding and not in imposing heightened standards of proof or in inequitably identifying constitutional rights in favor of one person against another"); *Mason*, *supra* at 183-84 ("the best interests of the child standard is one grounded in the particular needs and circumstances of the individual child in question") (citation omitted).

App. Ct. 257, 265-267 (2001); *Abbott* v. *Virusso*, 68 Mass. App. Ct. 326, 328-331 (2007). Where the parent seeking to move has *not* been given sole physical custody, then — as *Mason* teaches — the calculus is appreciably different: the importance to the children of the benefits of the move to that parent become "greatly reduced," and it therefore becomes more difficult for the parent to justify the uprooting of the child. *Mason, supra* at 184-85.

As the husband acknowledges, the judge below did not determine that he should have "sole physical custody" before addressing where the children should live. Instead, the judge rejected the concept of "physical custody" and emphasized his view that each parent should receive "relatively equal parental time" (even if his final arrangement fell short of meeting that standard).[11] Indeed, the goal of directly involving both parents in the day-to-day lives of the children was — at least on the surface — the driving force behind the judge's order. While the co-parenting arrangement the judge had in mind does not fit neatly into the traditional taxonomy, it can perhaps best be understood as an attempt at approximating joint custody within the practical constraints posed by the parents living far apart. We therefore agree with the husband that *Mason*, and not *Yannas*, provides the proper lens through which to evaluate the judge's ruling. Compare *Abbott* v. *Virusso, supra* at 328-330 (applying *Yannas* where the party seeking to move was the child's "primary care parent"). Our conclusion is reinforced by the fact that the judge made no attempt to justify the removal decision using a *Yannas* analysis. To the contrary, he proclaimed at the commencement of trial that he was simply going to "ignore the removal issue."

Although we agree with the husband that *Mason* applies, it does not follow that this provides support for the husband's position. As our discussion above indicates, *Mason* calls for a searching inquiry whether the geographical uprooting of the chil-

---

[11]The judge nevertheless did make some findings that suggest that he favored the husband as a caretaker over the wife. These findings alone do not provide adequate legal support for the judge's decision to allow removal of the children to New Hampshire, especially given that the judge principally tried to justify his decision by saying that he was trying to equalize the time each parent spent with the children. Moreover, as discussed below, whether these findings are supported by the evidence is questionable, and the findings must be reassessed on remand.

dren is in their interest.[12] As set forth below, the judge failed to make that inquiry. Moreover, *Mason* also makes clear that joint custody often is not feasible and that its feasibility turns on a variety of factors including the geographical distance separating the parents and the degree of cooperation that both are able to exhibit. *Id.* at 182-186. Although the judge sought principally to justify his ruling as one that allowed shared custody, he never came to grips with the manifest obstacles to the feasibility of that arrangement.

It is undisputed that the children have lived in the Stoughton area their whole lives, save for weekends and vacations. The daughter attended kindergarten at the Dawe Elementary School, and she was slated to continue there in first grade. The children regularly enjoyed "play dates" with their friends, and they spent considerable time with their maternal grandparents, the Millers, who live in Canton.[13] The fact that the children had a settled life in Stoughton alone obviously does not preclude a determination that their interests are best served by relocating them to central New Hampshire.[14] It does, however, establish a baseline against which the removal decision must be measured. Before allowing "[t]he uprooting of [children] of tender years," the court must

[12]If *Yannas* had applied, then the husband could have relied on the more forgiving "real advantage" analysis. Although the judge did not make any express determination that the husband's move to New Hampshire provided him a "real advantage," there was evidence upon which he could have done so. Contrary to the wife's arguments, there are manifest reasons why the move to New Hampshire made sense for the husband: job opportunities, extended family, and his avid love of outdoor activities. In addition, despite the demonstrated rancor between the parties, the idea that the husband moved merely to spite the wife lacks inherent plausibility. Of course, just because a move to New Hampshire may be in the husband's interest does not mean that it is necessarily in the children's best interests to follow him there.

[13]In particular, Ms. Miller consistently saw her grandchildren at least two to three times each week. The paternal grandmother, who lives in southern New Hampshire (and who no doubt loves her grandchildren just as much), saw the children less frequently and, in recent years, "only once every few weeks."

[14]In addition to the children's being firmly rooted in Stoughton, we note that the daughter had demonstrably benefitted from ready access to the medical resources of the Boston area and that — as the judge found — while she exhibits no current symptoms, her serious condition needs to be monitored. There was no evidence presented as to how the medical resources of the Greater Rochester area may compare to those in Boston.

examine whether there are "compelling reasons" to do so. *Jones* v. *Jones*, 349 Mass. 259, 264 (1965).

Consistent with his promise to "ignore the issue of removal," the judge paid scant attention to the impact on the children of their leaving the only community in which they had ever resided. This is well illustrated by the abruptness with which the judge effected the move. After a trial that stretched over the course of one year, the judge issued the judgment nisi on April 15, 2009. Despite the fact that the end of the school year was rapidly approaching, the wife was ordered to turn the children over one week later, thus preventing the five year old daughter from completing her kindergarten year in Stoughton.

The trial judge did state repeatedly that it was his conclusion that relocating the children was in their best interest. But such an ultimate conclusion needs a foundation in the record supported by "ground-level facts." See *Felton* v. *Felton*, 383 Mass. 232, 240 (1981). The factual basis upon which the judge determined that relocation was in the children's best interest remains opaque. While he extolled the benefits of having the children live in one location without their constantly having to shuttle back and forth between Stoughton and Gonic, these are benefits that may justify changing the existing arrangement. They are not reasons for choosing Gonic over Stoughton. In addition, while the judge noted that the children had some ties to New Hampshire (having spent frequent weekend visits and summer vacation time there) and that they were adaptable, such factors at best mitigate the degree of dislocation that the move would engender; they do not supply a reason for why the move should occur.

The judge also erred by neglecting to examine reasonably available alternative arrangements. Cf. *Yannas*, 395 Mass. at 711 ("[t]he reasonableness of alternative visitation arrangements should be assessed"). There is in fact little evidence that he seriously considered the option of having the children continue to reside in Stoughton, while traveling less to New Hampshire. He focused instead on how his preferred option compared to the existing arrangement.

Moreover, it does not appear that the judge considered the potentially available option of the husband's moving to southern New Hampshire. From all that appears on the present record,

the husband's assignment to the Strafford County patrol area may well have been by choice, especially considering his willingness to work the midnight shift. His reassignment to the Rockingham County patrol area, if possible, would allow him to live right across the Massachusetts border, opening up a host of custody and visitation options. See *Mason*, 447 Mass. at 185-186 (discussing the circumstances under which co-parenting can work).[15]

Finally, although we appreciate the judge's desire to make a joint custody arrangement succeed, there are substantial doubts about whether this is feasible in light of both the geographical distance and the parties' demonstrated inability to get along. *Mason, supra* at 182 ("[s]hared physical custody in particular carries with it substantial obligation for cooperation between the parents"). At a minimum, in the circumstances here, the judge should have considered whether one parent or another should be the primary or sole caretaker of the children.

In sum, the judge erred by inadequately examining the impact of the move on the children, by allowing them to be uprooted without identifying any distinct advantages that relocation would bring to them, by failing to assess reasonably available alternative arrangements, and by failing to consider whether a shared custody arrangement of the type he envisioned would really work for the parents or the children. Under these circumstances, his decision allowing removal cannot stand. The question remains how to proceed from here. In some cases, we have directed that questions of custody or removal be answered in a particular manner, because the evidence before us on appeal "convincingly establishes" that that result is correct. See, e.g., *Rosenthal* v. *Maney*, 51 Mass. App. Ct. at 272. We do not believe that this is one of those cases, especially given that there has been no prior adjudication that one parent is deserving of sole physical custody. Instead, this is a case that warrants careful re-examination of the

---

[15]We recognize that such a move may be less desirable for him (given his avid pursuit of the recreational opportunities provided by central New Hampshire), but such compromises are an inevitable part of taking on the responsibilities of a joint custody arrangement. *Mason, supra* (for a true joint custody arrangement to work, each parent must "recognize that the viability of the endeavor is dependent on his or her ability and willingness to subordinate personal preferences to make the relationship work").

facts and available options by the trial judge, with further additional fact finding as necessary. See *Felton* v. *Felton,* 383 Mass. at 241-242. We therefore remand the custody and removal issues to the Probate and Family Court for such an assessment. In the interim, the children are to be returned to Massachusetts given that G. L. c. 208, § 30, prohibits removal except "upon cause shown." Specifically, the further temporary order dated August 3, 2007 — which determined temporary custody and child support prior to trial — is hereby reinstated and the children are to be returned to the wife no later than 5 P.M. on August 31, 2009. The parties may seek in the Probate and Family Court modification regarding child support and visitation while the matter is pending.

2. *The judge's factual findings.* Our decision to vacate the custody ruling and remand the matter does not depend on whether any particular findings the judge made were clearly erroneous. To help guide the remand, however, we will briefly address the manner in which the judge addressed certain of the factual issues. In focusing on how the judge handled these specific issues, we do not mean to suggest that he should confine the remand to addressing these issues. To the contrary, we emphasize that, in his assessment of where the best interests of the children lie, he should make a probing inquiry of the full panoply of relevant factual considerations.

In explaining the rationale behind his decision, the judge noted that the wife's "employment provides her with far more flexibility than [the husband's] provides him." By noting his view of the wife's job flexibility, the judge may have been suggesting that having the children reside in Gonic is the only feasible option that allows the children to be able to spend substantial time with both parents. But the judge did not explain how the wife's job is more flexible or why that matters. To the extent her job is more flexible, that flexibility — at least in some respects — would appear to favor Stoughton over Gonic. For example, the fact that she works for her father at a site five minutes from her home provides her great flexibility to attend to her children's needs. Moreover, in other respects, her job — a traditional office position with more ordinary business hours — is less flexible.[16] This could well constrain her ability effectively to live part-time

---

[16]One of the judge's findings could be taken to suggest that the judge

in New Hampshire (the arrangement contemplated by the judge in his order).[17]

Conversely, the husband's job is inflexible in some ways and flexible in others, and the particular mix offered does not necessarily favor having the children live with him. For example, the husband's unusual working schedule means that every thirty days, he will have three predictable blocks of time of almost four days in duration during which he does not have to work. This would allow him to spend substantial time with his children without disrupting his work schedule. In sum, although the flexibility of their respective work schedules is an appropriate consideration, the judge has not explained how it provides any substantial support justifying removal.[18]

The judge also found that the husband "was always the parent who tended to the greater percentage of the children's needs." At the same time, however, he specifically concluded that, before the separation, the husband spent only "slightly more time with the children." Moreover, it appears uncontested that, once the husband moved to Canton (shortly after he filed for divorce), the parties were under a custody arrangement that had the children

believed that the wife might return to her workaholic ways once custody is resolved. This would not support the judge's ultimate ruling, however, because it would be inconsistent with what the judge says he did: settling on a custody arrangement that — in light of the wife's greater job flexibility — allowed the children to spend a relatively equal amount of time with both parents. Moreover, "a parent who works outside the home, even one with a 'hectic' schedule, may still be the appropriate primary caretaker." *Rosenthal* v. *Maney, supra* at 263.

[17]The trial judge expressly found that relocating the children to New Hampshire was in the children's best interest irrespective of the fact that the wife's parents owned a vacation home one-half hour away from the husband's new home. In this manner, the judge disavowed relying on this happenstance.

[18]We also note that the ability of the husband to maintain a stable home appears, at this time, dependent entirely on the continued presence of Ms. Vasquez (a Panamanian national whose work permit has expired and who is now in the country on a student visa). For example, she is the only person available to attend to the immediate needs of the children when they awake during the night — as young children are wont to do — while the husband is on patrol. There was no evidence whether Ms. Vasquez is likely to stay in the picture once her studies have been completed and her student visa has expired, or on how the husband could manage to care for the children if she returns to Panama. We make no assumptions about this critical issue, but note that the unresolved nature of the issue further erodes the foundation of the judge's decision to allow removal.

spending about two-thirds of their time under the care of the wife. It also appears undisputed that after the husband moved to New Hampshire in August of 2007, the wife — who at that point had been granted sole physical custody — continued to have the children significantly more of the time. To put this into perspective, we note that the son, who was less than one year old at the time of separation, has spent significantly more time with the wife for the last three-quarters of his life (and only "slightly less" time with her before that). While time spent with the children does not necessarily equate with time spent attending to their needs, the judge's finding that the husband "was always the parent who tended to the greater percentage of the children's needs" at a minimum needs further explication.

The judge viewed as "even more important[]" that the husband "is more capable of assuring that the children maintain a close relationship with [the wife]." He specifically attributed this finding to Dr. Shumaker. However, the GAL report never made such a conclusion. In fact, although Dr. Shumaker refused to take sides, a careful review of his report reveals that, if anything, he had a greater concern about the husband's willingness to foster a positive relationship between the children and the wife, than the reverse. For example, with regard to concerns that the husband and his collaterals had expressed about the wife, Dr. Shumaker "pulled his punches" in his report, referring to the wife's "less than cooperative co-parenting stance." With regard to the concerns that the wife and her collaterals expressed about the husband, the GAL report was decidedly less reserved in its language and highlighted several specific incidents to document concerns about whether the husband would foster the children's relationship with the wife.

When questioned at oral argument about what in the GAL report supported the judge's key finding, counsel for the husband responded that such support could be found not in the report but in Dr. Shumaker's testimony at trial, specifically in counsel's direct examination of him. Through no apparent fault of either party, that testimony was not recorded and hence was not transcribed.[19] In the absence of a transcript of this portion of Dr. Shumaker's testimony, the husband has argued that the wife be

[19]Under the single justice's order, the transcript of the trial was produced, the record assembled, and the case briefed and argued all within two months

estopped from challenging any finding that could depend on that testimony, or — in the alternative — that the matter be remanded to the trial judge for him "to settle the content of the omitted testimony." See Mass.R.A.P. 8(c), 378 Mass. 933-934 (1979). Although we are somewhat skeptical about the husband's claim that Dr. Shumaker materially departed from the GAL report when he took the stand,[20] we agree with the husband's argument that rule 8(c) sets forth the appropriate procedure for resolving the content of testimony that was not transcribed. However, because our decision does not rest on the content of the missing testimony and a remand is necessary in any event, and in light of the need to expedite our review for the best interests of the children, we do not believe it is necessary to delay resolution of this appeal while the parties first go through the rule 8(c) process.[21] On remand, the judge is certainly free to revisit the substance of Dr. Shumaker's past testimony or to call him again.

3. *Property division.* The wife also challenges the division of the marital assets. Specifically, she claims that the judge improperly allowed the husband to use joint assets to fund the considerable debt he incurred during the divorce proceedings.[22]

of the issuance of the judgment nisi. After the husband called our attention to the gap in the transcript, we ordered two rounds of supplemental briefing on the issue. Although it appeared from the initial round of briefing that it may have been possible to locate a recording of the missing testimony, further investigation dashed those hopes.

[20]Had Dr. Shumaker — as the husband contends — materially departed from the conclusions set forth in the report, one would have expected an aggressive cross-examination that sought to impeach him with his own report. There is no evidence of this in the wife's cross-examination (most of which was recorded and transcribed). To the contrary, that cross-examination reveals the uncommon precision exhibited by Dr. Shumaker in trying to ensure that the statements he made in the GAL report were not mischaracterized.

[21]We respectfully disagree with the suggestion in the dissenting opinion that our discussion "reveals" that "this is a close case" regarding the custody issues. Moreover, in light of our conclusion that a remand would be necessary even if the missing testimony supported the judge's finding on which party is more "open," we believe that having a single remand will actually save the resources of the parties and the court.

[22]She argues that the judge accomplished this in two ways: (1) by allowing $35,000 from the proceeds of the marital home to be used toward payment of the husband's outstanding credit card debt before the remainder was divided equally between the parties, and (2) by ordering the wife to turn over half of her retirement account to the husband even though he had liquidated and

According to her, this effectively gave the husband eighty-five percent of the marital estate. In addition to claiming that this split was generally unfair, the wife argues that some of the husband's specific expenses should not in any event be funded by the marital assets, such as payment for part of Ms. Vasquez's tuition, rent for a lakeside home used primarily by Ms. Vasquez while the husband attended the police academy, and rooms at the Cambridge Hyatt Hotel. See, e.g., *Ross* v. *Ross*, 385 Mass. 30, 37-38 (1982) (endorsing judge's division of marital assets because rationale reflected his consideration of fact that "some of the marital assets may have been used to support another woman").

Our review of a judge's division of marital assets is extremely limited. Section 34 of G. L. c. 208 sets forth the factors to be employed, and we are to determine "whether [the judge] considered all the relevant factors under § 34, and no irrelevant factors." *Baccanti* v. *Morton*, 434 Mass. 787, 790 (2001). "We then determine whether the reasons for his conclusions are apparent and flow rationally from his findings and rulings." *Ibid.* (internal quotation omitted). In the end, a probate judge enjoys "considerable discretion in determining how to divide the assets equitably." *Id.* at 792. The Supreme Judicial Court has cautioned that appellate courts should "not reverse a judgment with respect to property division unless it is 'plainly wrong and excessive.' " *Id.* at 793, quoting *Mahoney* v. *Mahoney*, 425 Mass. 441, 447 (1997). See *Williams* v. *Massa*, 431 Mass. 619, 626 (2000) ("an equitable, rather than an equal, division of property is the ultimate goal of G. L. c. 208, § 34").

In the portion of his rationale on the division of property, the judge began with a boilerplate recitation that he applied all of the § 34 factors. He then continued — and ended — his analysis by stating as follows:

> "Prior to the parties' separation, after a relatively short-term marriage, each of the parties had contributed to the best of their ability, considering the time and resources

spent his similarly-sized retirement account while the divorce proceedings were pending. She also complains that the judge allowed the husband to keep his boat, snowmobile, firearm collection, and other personal property without providing her credit for the significant value of those items.

available to each, to the marital enterprise. While the wife earned more money during the marriage than did the husband, the husband spent more time tending to the needs of the children than did the wife, owing in considerable part to the demands that work placed on her time. The parties also benefitted significantly from the largess of the wife's parents."

This passage does not provide an adequate explanation for the particular path that the judge chose. While it seems to suggest that the marital assets should be divided evenly, it does nothing to explain why the husband should be allowed to use marital assets for the massive expenses he incurred during the divorce without the wife enjoying reciprocal treatment. Nor does it address the wife's arguments that some of the husband's expenses were independently improper.[23] Because the judge failed to address an entire aspect of the dispute, a remand is necessary for the judge to explain his reasoning. *Redding* v. *Redding*, 398 Mass. 102, 108-109 (1986). Accord *Bowring* v. *Reid*, 399 Mass. 265, 268 (1987) "On remand, the judge should supplement his discussion to address the omitted subjects." *Redding* v. *Redding*, *supra* at 109.[24]

Finally, the wife makes a separate argument with regard to one specific item of personal property in dispute: a large safe that had been used to house the husband's considerable array of firearms. It is uncontested that the safe was nominally purchased by PM Associates. On this basis, the wife argues that the safe actually belongs to the company and that the court erred by

---

[23]In fact, it appears that the judge did not in the end allow the husband to "charge" all of his debt against the marital estate (given that his total credit card debt was significantly higher than the $35,000 payment allowed). The difference may well reflect the judge's acceptance of the wife's argument against her having to fund any expenses incurred primarily for the benefit of Ms. Vasquez, a conclusion that is supported by certain comments the judge offered during the trial. As the Supreme Judicial Court has made clear, however, "the reasons for the judge's conclusions must be apparent from the judge's findings and rulings." *Bowring* v. *Reid*, 399 Mass. 265, 267 (1987), citing *Redding* v. *Redding*, 398 Mass. 102, 108 (1986).

[24]We do not mean to suggest that we have concluded that the division of property here was "plainly wrong and excessive," and we note that the end result is hardly as one-sided as the wife suggests. For example, the judge allowed the wife to keep her forty percent interest in PM Associates, the potentially most valuable asset in dispute.

ordering her to turn it over to the husband without the company being joined as a party. The husband testified at trial that, at the time the safe was purchased, a corresponding amount was docked from what the company otherwise owed to him (testimony that the wife and her father actively disputed to the point of suggesting that the husband had falsified company records). The judge offered no explanation of his ruling on the safe, despite the fact that the contest over it was the most fully developed issue at trial. To the extent that the judge credited the husband's account and determined that the husband's claim to the safe was superior to the wife's, there was no independent error in the judge's order to the wife to turn over the safe to him, regardless of whether the judgment terminated any rights the company may have to it (a question we do not decide).[25]

*Conclusion.* For the reasons set forth above, the judgment insofar as it pertains to custody and removal of the children, child support, and division of property is reversed. We remand the matter to the Probate and Family Court for further proceedings as directed in this opinion. Pending such further proceedings, the further temporary order dated August 3, 2007 — which determined temporary custody and child support prior to trial — is hereby reinstated and the children are to be returned to the wife no later than 5:00 P.M. on August 31, 2009. The parties may seek in the Probate and Family Court modification regarding child support and visitation while the matter is pending. The remainder of the judgment is affirmed.[26] The rescript is to issue forthwith.

*So ordered.*

McHugh, J. (dissenting). I agree with much the majority opinion contains and am in full agreement with the majority's disposition of the claims regarding property division. But as the majority's discussion reveals, this is a close case on both the property division and the custody issues. Through no fault of

---

[25]We do note, however, that Mr. Miller — who personally ran PM Associates — actively participated in the trial, and his lawyer was allowed to object to questioning that involved his client.

[26]In light of our decision, the husband's request for attorney's fees is denied.

the parties, none of the direct testimony of the court-appointed guardian ad litem, Dr. David Shumaker, was recorded and some portion of the cross-examination was omitted as well. As the majority's extended discussion of the GAL report indicates, Dr. Shumaker had much to offer on the proper outcome of the custody dispute. We are, however, vacating the trial judge's decision in a close case without knowing all of the evidence that was before him.

Instead of upsetting the trial judge's handiwork on an incomplete record, I would require the parties to proceed in the manner contemplated by Mass.R.A.P. 8(c), 378 Mass. 933-934 (1979).[1] That is the traditional method for dealing with missing or unrecorded testimony. See generally *Patten* v. *Mayo*, 23 Mass. App. Ct. 657, 659-660 (1987). Counsel for the appellant, who in this case simply filed what he claimed was the entire transcript without notifying either the court or the appellee that Dr. Shumaker's direct testimony was entirely missing, had an obligation to proceed in that fashion, at least to the extent that counsel was asserting that the trial judge's custody decision was unsupported by the evidence. See, e.g., *Houston* v. *Houston*, 64 Mass. App. Ct. 529, 538 n.15 (2005); Mass.R.A.P. 8(b)(1), as amended by 430 Mass. 1601 (1999).

There is no reason why a rule 8(c) procedure cannot be conducted expeditiously and, in any event, I see no reason to draw inferences about the content of Dr. Shumaker's testimony or to say, in effect, that the testimony is irrelevant to the outcome of the appeal no matter what it was, when there is an unused, traditional, and readily available procedure for establishing what,

---

[1]That rule provides:

"Statement of the Evidence or Proceedings When No Report Was Made or When the Transcript Is Unavailable. If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may, within thirty days after the notice of appeal is filed, file a statement of the evidence or proceedings from the best available means, including his recollection. The statement shall be served on the appellee, who may file objections or proposed amendments thereto within ten days after service. Thereupon the statement and any objections or proposed amendments thereto shall be submitted to the lower court for settlement and approval and as settled and approved shall be included by the clerk of the lower court in the record on appeal."

in fact, Dr. Shumaker said while on the witness stand. Before saddling both the parties and the court with a new, potentially extended, and expensive round of hearings on the custody issue, and before vacating a custody order that may be reinstated at the conclusion of the new round of hearings, I think we should know as much as we possibly can about what happened at a critical stage of the first round. For that reason, I respectfully dissent.