## C. Michael Woodside vs. Sharry A. Woodside.

No. 10-P-149.

Middlesex. March 1, 2011. - June 24, 2011.

Present: Grasso, Graham, & Hanlon, JJ.

*Parent and Child,* Custody. *Minor,* Custody. *Probate Court,* Findings by judge, Custody of child. *Divorce and Separation,* Child custody, Alimony.

In a divorce matter brought in Probate and Family Court in which the mother sought to remove the parties' two minor children to Maine, the judge's finding that the mother was the primary caregiver of the children was amply supported by the evidence, and the judge therefore did not abuse her discretion in determining removal based on the so-called "real advantage" test [715-718]; further, the judge properly concluded that the mother had a good faith reason for the requested move and was not motivated by a desire to deprive the father of his relationship with the children, and there was no error in the judge's consideration of the best interests of the children and her conclusion that removal would have a positive impact on their emotional, physical, and developmental needs [718-720].

In a divorce matter, the judge's award of alimony was properly grounded in appropriate considerations of the relevant statutory factors. [720-723]

Complaint for divorce filed in the Middlesex Division of the Probate and Family Court Department on May 15, 2008.

The case was heard by *Maureen H. Monks,* J.

*Wendy H. Sibbison* for C. Michael Woodside.

*Robert A. George* for Sharry A. Woodside.

Graham, J. The father, C. Michael Woodside, appeals from a Probate and Family Court judgment of divorce nisi allowing the mother, Sharry A. Woodside, to remove the parties' two minor children to Maine and ordering him to pay alimony to the mother. The parties were divorced on March 12, 2009, and a "Bifurcated Judgment of Divorce Nisi" (first judgment), dated March 12, 2009, incorporated the parties' agreement as to custody and visitation of the children. On the same date, a temporary order entered ordering the parties to comply with the terms of

the agreement. Issues of property division and support were reserved for trial. The mother subsequently filed a complaint for removal, which was tried, by agreement, with the property and support issues. A second "Bifurcated Judgment of Divorce" (second judgment), dated August 24, 2009, amended the first judgment by allowing the mother's petition for removal, and ordered a division of property and the father to pay weekly alimony and child support. Both the first and second judgments were entered on October 9, 2009. The father appeals from the second judgment insofar as it allows removal of the children and awards alimony. We affirm.

*Background.* The parties were married on April 23, 1993, in Antigua and lived in Florida and Texas before settling in Massachusetts in August, 2003. The parties have two daughters, the first born on January 27, 2000, and the second born on May 5, 2005. The parties lived together in the marital home until the time of their separation in April, 2008; the children remained with the mother in the marital home when the parties separated.

In April, 2008, in response to comments made by the children, the mother became concerned that father was possibly engaging in inappropriate sexual behavior with the parties' children. Later that month, she obtained a temporary restraining order, subsequently extended for one year, ordering the father to vacate the marital home. The Department of Social Services[1] (Department) concluded after investigation that "the allegations are unsupported as the children did not disclose any sexual abuse or inappropriate actions" by the father. The Pepperell police department also filed an incident report, following an attempt to investigate the hard drive of the father's computer, that noted that sexual assault related charges may follow.

The father filed for divorce in May, 2008, and in June, 2008, the parties agreed to a schedule whereby the father would have supervised visitation with the children one weeknight evening and one weekend day each week. In August, 2008, the mother agreed to allow the father unsupervised visitation with the children, pending the results of a report from the guardian ad litem (GAL) appointed to investigate the issue. The GAL report,

---

[1]Now known as the Department of Children and Families.

submitted to the Probate and Family Court in February, 2009, concluded that there was no need for supervised visitation but acknowledged that the mother's concerns were understandable, given the appearance of "suspicious or at least questionable" actions by the father.

Judgment proceeded in two stages. The first judgment, dated March 12, 2009, incorporated the parties' separation agreement and provided for joint legal custody and that "the children shall reside primarily with the wife." The parenting schedule afforded the father visitation two weeknights each week, alternating weekends, alternate holidays, and two weeks of vacation time.

The parties agreed to proceed to trial on issues of property division and support. The mother subsequently filed a complaint for authorization to remove the children from the Commonwealth to Maine, which was consolidated with the remaining matters. Following trial, the judge found that the mother proved by a preponderance of the evidence that she had a good faith reason for the requested move to Maine and that such a move would be in the children's best interests. The second judgment, dated August 24, 2009, allowed the mother to remove the children to Maine and ordered the father to make a weekly family support payment of $900, of which $500 was designated as alimony and $400 as child support in order to provide the father some tax relief.

*Discussion.* 1. *Removal standard.* The father challenges the removal order on several grounds. First, he asserts, it was error to apply the "real advantage" test, articulated in *Yannas* v. *Frondistou-Yannas*, 395 Mass. 704, 710-712 (1985), because the mother was not the sole physical custodian of the couple's children. He further claims that, even assuming the real advantage test was the correct standard, the judge improperly concluded that the mother demonstrated a good faith reason for the move and that she was not motivated by a desire to deprive the father of his relationship with the children.

We turn first to the father's claim that the real advantage test is inapposite in a situation where neither party is specifically designated as having "sole physical custody" of the children. The removal of children of divorced parents from the Commonwealth is governed by G. L. c. 208, § 30, which requires

the consent of both parents "unless the court upon cause shown otherwise orders." G. L. c. 208, § 30. That phrase has been interpreted to mean that removal must be in the child's best interests. *Smith* v. *McDonald*, 458 Mass. 540, 546 (2010), citing *Yannas, supra* at 711. The statute is intended to "preserve the rights of the noncustodial parent and the child to maintain and develop their familiar relationships, while balancing those rights with the right of the custodial parent to seek a better life for himself or herself." *Wakefield* v. *Hegarty*, 67 Mass. App. Ct. 772, 775 (2006), citing *Yannas, supra* at 712.

Removal petitions are evaluated under one of two analyses. When a parent with sole physical custody of the child seeks to relocate the child outside the Commonwealth over the objection of the noncustodial parent, the real advantage test articulated in *Yannas, supra* at 710-712, applies. That test is distinguished by its sensitivity to the reality that, due to the responsibilities of sole physical custody and caretaking, "the best interests of a child are so interwoven with the well-being of the custodial parent, [that] the determination of the child's best interest requires that the interests of the custodial parent be taken into account." *Id.* at 710, quoting from *Cooper* v. *Cooper*, 99 N.J. 42, 54 (1984). See *Altomare* v. *Altomare*, 77 Mass. App. Ct. 601, 603-604 (2010). The judge must first consider whether the custodial parent is able to demonstrate "a good, sincere reason for wanting to remove to another jurisdiction" and "the presence or absence of a motive to deprive the noncustodial parent of reasonable visitation." *Yannas, supra* at 711. If the custodial parent sustains that burden, the second prong of consideration is whether the move is in the best interests of the child. The judge must consider "whether the quality of the child's life may be improved by the change (including any improvement flowing from an improvement in the quality of the custodial parent's life), the possible adverse effect of the elimination or curtailment of the child's association with the noncustodial parent, and the extent to which moving or not moving will affect the emotional, physical, or developmental needs of the child." *Altomare, supra,* quoting from *Pizzino* v. *Miller*, 67 Mass. App. Ct. 865, 870-871 (2006). "No single factor is determinative." *Smith* v. *McDonald, supra* at 547, citing *Yannas, supra* at 711-712.

If the parent seeking removal from the Commonwealth, however, shares physical custody with the other parent, "[t]he advantage to the moving parent becomes merely a relevant factor in the over-all inquiry of what is in the child's best interests." *Wakefield* v. *Hegarty, supra* at 776, citing *Mason* v. *Coleman,* 447 Mass. 177, 185-186 (2006). Where custody is shared between parents, the analysis does not privilege the interests of one parent because "the fortune of simply one custodial parent [is not] so tightly interwoven with that of the child; both parents have equal rights and responsibilities with respect to the child[]." *Id.* at 184-185.

While we acknowledge that "[h]ow a custody arrangement is categorically defined will trigger which of the two models is implicated," *Altomare, supra* at 605, the differences between the two approaches reflect consequences of functional divisions in caregiving and parental responsibilities. See *ibid.* ("it is appropriate that the decisional calculus consider the functional responsibilities and involvement of each parent"). The primary consideration in both tests remains whether the proposed move is in the best interests of the child. See *Prenaveau* v. *Prenaveau,* 75 Mass. App. Ct. 131, 139 (2009). Although the presence of a categorical custodial determination will trigger one of the two approaches, nothing in our case law requires that either analysis be employed solely where the parents have adopted a particular custodial label. Where, as here, the parties have eschewed traditional custodial terminology, the judge must make "a factual inquiry" to determine the approximate custodial arrangement and then apply the corresponding test. *Altomare, supra* at 606. See *Abbott* v. *Virusso,* 68 Mass. App. Ct. 326, 327-330 (2007) (applying *Yannas* where the party seeking to move was the child's "primary care parent"); *Prenaveau, supra* at 140 (approving the use of *Mason* analysis where "the co-parenting arrangement . . . does not fit neatly into the traditional taxonomy, [but] it can perhaps best be understood as an attempt at approximating joint custody"). Cf. American Law Institute, Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.17(4)(a), at 400 (2002) ("The court should allow a parent who has been exercising the clear majority of custodial responsibility to relocate with the child if that

parent shows that the relocation is for a valid purpose, in good faith, and to a location that is reasonable in light of the purpose").

In the instant case, the judge found that the mother "has been and continues to be the primary caregiver for the [parties'] children." The parenting schedule incorporated into the first judgment, in effect at the time of trial on the mother's complaint for removal and which the father does not challenge, provided that the children would live with the mother, subject to scheduled visitation with the father; the children spent nights with the father only on alternating weekends and during two nonconsecutive weeks of summer vacation. The judge found that despite the parental rights available to him, the father essentially chose to defer major parenting tasks and decisions to the mother during the marriage and following the separation. No significance attaches to the absence of custodial language in the separation agreement where the functional arrangements agreed on by the parties confer on the mother primary responsibility for the children.[2] In sum, the judge's finding that the mother was the primary caregiver was amply supported by the evidence, and the judge did not abuse her discretion by applying the *Yannas* real advantage test. See *Wakefield* v. *Hegarty*, 67 Mass. App. Ct. at 776-777.

Having determined that the judge applied the correct test, we address the father's argument that the judge improperly concluded that the mother had a good faith reason for the requested move and was not motivated by a desire to deprive the father of his relationship with the children. The first prong of the real advantage test focuses "on the reasoning of the custodial parent." *Dickenson* v. *Cogswell*, 66 Mass. App. Ct. 442, 448 (2006). The judge acknowledged that the GAL concluded that the mother's job prospects in Maine "were speculative at best," but found that she would benefit from the opportunity for accelerated job training opportunities and the potential for higher future earnings. The judge also found that, in addition to employment prospects, the mother's request was motivated by a desire to be

---

[2]We draw no inferences from the fact that the parties struck a provision in the separation agreement providing joint physical custody, nor do we attach significance to the fact that the parties attempted to add but then struck a provision affording sole physical custody to the mother.

close to family members in Maine. The judge concluded that the mother's quality of life would be improved by having the support of nearby relatives who could assist her with childcare. The mother therefore has demonstrated by sufficient evidence that the move is of "real advantage" to her. *Cartledge* v. *Evans*, 67 Mass. App. Ct. 577, 580 (2006). See *Altomare*, 77 Mass. App. Ct. at 607-608 ("Relocating in order to avoid painful emotional encounters and to develop emotional support is a sincere reason").

The judge further found, supported by evidence in the record, that the mother was not motivated by an intent to deprive the father of his relationship with their two daughters. Although the restraining order prohibited the father from contacting his children for a period of time, the judge concluded that the mother acted out of a good faith concern for the safety of the children. The mother has also been reliable and supportive of the father's visitation with the children. She voluntarily agreed to end supervised visitation following the investigation by the Department, and offered the father increased visitation time with the children on weekends and during vacations should the children be allowed to move to Maine. There was no error in the judge's finding that the mother had established a good faith, sincere reason for desiring the move.

In addition, there was no error in the judge's consideration of the best interests of the children and her conclusion that removal would have a positive impact on their emotional, physical, and developmental needs. "At this second stage '[e]very person, parent and child, has an interest to be considered. The judicial safeguard of those interests lies in careful and clear fact-finding . . . .' " *Wakefield* v. *Hegarty*, 67 Mass. App. Ct. at 776, citing *Yannas*, 395 Mass. at 712. "Assuming the judge's findings are not clearly erroneous, we review [the judge's] determination of the best interests of the children only for an abuse of discretion." *Mason* v. *Coleman*, 447 Mass. at 184, citing *White* v. *Laingor*, 434 Mass. 64, 68 (2001). The judge based her conclusion in part on her findings that the move would result in an improvement in the mother's quality of life that in turn would benefit the children, and that the proximity to the mother's family members, who could assist in caretaking, would also benefit

the children. See *Wakefield* v. *Hegarty,* 67 Mass. App. Ct. at 777-778. The judge also considered the impact of removal on the children's relationship with the father and the deleterious effects of increased travel, and adjusted the visitation schedule to increase the children's time spent with the father during the weekends, summer, and other school vacations, as well as to limit the travel time between the parties' homes. See *Cartledge* v. *Evans, supra* at 581 ("disruption in visitation with the noncustodial parent cannot be controlling or no removal petition would ever be allowed").

2. *Alimony award.* Applying the child support guidelines, the judge concluded in her findings that a weekly child support payment of $647 was "suggested," but ordered the father to make weekly payments totaling $900, of which $400 was designated child support and $500 alimony. The judge noted in her findings that this division was intended to be of financial benefit to the father: "In order to provide the father some tax relief especially during this time when the mother has little or no taxable income, the Court has allocated the majority of this payment as alimony and given the father the right to claim both children as dependents." See Child Support Guidelines § II.A (effective January 1, 2009). The total amount, the judge found, constituted approximately thirty-six percent of the father's total income. Father challenges the award[3] on the grounds that it forces him to spend more than his income and that the judge did not properly account for the mother's ability to earn income as a massage therapist.

The award of alimony is governed by G. L. c. 208, § 34, inserted by St. 1974, c. 565, which requires consideration of certain mandatory factors: "the length of the marriage, the conduct of the parties during the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income." See *Cherrington* v. *Cherrington,* 404 Mass. 267, 271 (1989). The judge may also consider "the

---

[3]Father concedes that $647 is the correct amount of child support under the child support guidelines. Where his total weekly payment is $900, he argues that an alimony award in either amount of $253 or $500 is excessive.

contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates and the contribution of each of the parties as a homemaker to the family unit." G. L. c. 208, § 34, as amended by St. 1977, c. 467. Within these statutory constraints, a judge has broad discretion when making an award. *Drapek* v. *Drapek*, 399 Mass. 240, 243 (1987). We will only overturn an award on appeal if it is "plainly wrong and excessive." *Heins* v. *Ledis*, 422 Mass. 477, 481 (1996), quoting from *Pare* v. *Pare*, 409 Mass. 292, 296 (1991).

The judge made numerous findings, supported by the record, regarding the statutory considerations. The parties were married for about sixteen years (a medium- to long-term marriage) and enjoyed a middle-class station in life while married. Although both parties contributed to the marital enterprise, the mother was the primary caregiver to the children while the father was the primary wage-earner, working, as he still does, as a software engineer. The mother requires assistance in meeting her weekly expenses for herself and the parties' children, and the father does not need such assistance and has the ability to contribute to the expenses of the mother and the children.

Regarding the mother's earning capacity, the judge found that the mother, who worked as a massage therapist in the early years of the parties' marriage, had not worked in such a capacity in many years and had not contacted the licensing board of Massachusetts to determine whether she could become licensed in this state through a "grandfathering" of her previous licenses in Florida and Texas. At the time of trial, she was earning approximately $50 to $70 per week from part-time employment as a medical transcriptionist in training. The judge concluded that the mother's plans to continue with training could in time lead to higher income, thereby reducing her need for alimony.

"[T]he statutory authority of a court to award alimony continues to be grounded in the recipient spouse's need for support and the supporting spouse's ability to pay." *Gottsegen* v. *Gottsegen*, 397 Mass. 617, 624 (1986). In light of the significant period of time since the mother last practiced as a massage therapist, during which she was the primary caretaker for the parties' children,[4] and the fact she is licensed in neither Mas-

---

[4]See, e.g., *Bak* v. *Bak*, 24 Mass. App. Ct. 608, 622 n.14 (1987) ("In a

sachusetts nor Maine, the judge was not obligated to attribute to the mother earnings she could potentially have as a massage therapist. See *Pierce* v. *Pierce*, 455 Mass. 286, 297 (2009) ("A judge . . . is not obligated to use a party's potential earning capacity as the measure of the party's ability to pay"). See also Kindregan & Inker, Family Law & Practice § 38.3, at 624 (3d ed. 2002) ("When a spouse's employment prospects are limited, and the other has an income-producing occupation, other factors being also considered, the court may be more inclined to grant alimony"). The judge's consideration of mother's present earning capacity and financial need was not an abuse of discretion.

We also find no merit in the father's claim that the judge "exceeded [her] authority by basing the Father's present alimony award on an uncertain future event: the sale of the marital home." Father argues that, pending an unknown future sale of the marital home, the judgment required him to live on deficit spending. See *Schuler* v. *Schuler*, 382 Mass. 366, 375 (1981) ("we do not hold that a support provider would have to deplete his total liquid or other assets in an effort to meet his support obligations"). Thus, the father asserts that the alimony order within the second judgment must be vacated.

The total support award did not exceed father's income at the time of trial, as demonstrated by the income and expenses claimed on his financial statement. The judge found that "[s]ubtracting his weekly living expenses . . . , the father has a weekly disposable income of $1461.12."

Father argues that his expenses have since increased because he moved into the marital home, vacated when the mother and children moved to Maine, and he is now solely responsible for the carrying costs of the home, pending sale, causing him to incur a net weekly deficit of approximately $226.[5]

The judge found that the father's weekly credit card payment

marriage during which the wife has remained out of the work force for some time and has been the primary caretaker of the children [while the husband advanced his career], her likelihood of becoming self-sufficient has to be considered with care").

[5]Regarding the division of marital property, the judge ordered in the second judgment that if one party resides in the marital home pending the sale, that party shall be responsible for the carrying costs of the property. The second judgment further provided that if neither party resides in the home, the father

of $534.40 would presumably be discharged upon the sale of the marital home. We note that, independent of the sale of the home, the father's credit card debt, repaid at this weekly rate, would have been discharged approximately six and one-half months after trial (in February, 2010). Moreover, the record is devoid of any order requiring the father to repay the credit card debt at the weekly sum of $534.40. Rather, it appears from the record that the father chose the payment amount in order to repay the credit card debt in a short period of time. Therefore, any temporary deficit spending would have been created by the father, and could be eliminated by simply reducing the amount of such payments. Were those payments reduced in an amount that would eliminate weekly deficit spending, on the record before us, the credit card debt would have been paid approximately eleven months from the date the judgment was entered.[6]

In sum, the award of alimony was properly grounded in appropriate considerations of the statutory factors, and we discern no error with the alimony award.

So much of the bifurcated judgment of divorce dated August 24, 2009, as allows the mother's petition to remove the children to Maine and orders the father to pay weekly alimony in the amount of five hundred dollars is affirmed. The order denying the motion for reconsideration is affirmed.

*So ordered.*

---

shall be responsible for the carrying costs, and would be reimbursed for forty-five percent of the total carrying costs from the mother's share of the proceeds following the sale of the home. Upon the sale of the marital home, the father was to receive fifty-five percent of the net proceeds and the mother forty-five percent.

[6]The father's argument also neglects to consider the division of property. See *Grubert* v. *Grubert*, 20 Mass. App. Ct. 811, 818 (1985) ("While equitable division may involve considerations other than those determinative of alimony, an order for division of property cannot be viewed apart from alimony. The amendment of G. L. c. 208, § 34, in 1974 empowered the court to 'deal broadly with property and its equitable division in ways not previously authorized' ") (citations omitted). The father received "a slight credit" in the over-all division of property because of assets he purchased prior to the marriage, though the judge concluded that such " 'extra contribution' has been long ago commingled into the joint marital enterprise."