## CARE AND PROTECTION OF JAMISON.

Franklin-Hampshire. September 4, 2013. - February 20, 2014.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Minor,* Care and protection, Visitation rights. *Jurisdiction,* Care and protection of minor, Juvenile Court. *Juvenile Court,* Jurisdiction. *Guardian. Evidence,* Unavailable witness, Expert opinion. *Witness,* Child, Unavailability, Expert, Psychiatric examination, Psychologist.

This court concluded that the Juvenile Court has jurisdiction to consider petitions for sibling visitation pursuant to G. L. c. 119, § 26B (*b*), where the petitioning child is in State custody and his or her siblings are wards subject to guardianship established in the Probate and Family Court. [276-280]

A Juvenile Court judge, in granting a petition, pursuant to G. L. c. 119, § 26B (*b*), of a child in State custody to visit his two siblings, who were wards in the custody of legal guardians who objected to visitation, did not err as a matter of law in declining to apply to the guardians' views the presumption of validity afforded parental judgments as to the best interests of their children with respect to grandparent visitation [280-284]; however, because further evidence was needed to determine whether visitation was in the best interests of all three children, and not just the petitioning child, this court remanded the matter to the Juvenile Court, so that psychological evaluations of the siblings as necessary and appropriate to an assessment of the impact upon them of the requested visitation could be performed and expert evidence in that regard could be available to the judge, along with other evidence, when determining whether the requested visitation is in each of the siblings' best interests [284-290].

PETITION filed in the Franklin and Hampshire Counties Division of the Juvenile Court Department on September 28, 2007.

A motion for sibling visitation, filed on April 15, 2011, was heard by *James G. Collins,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Ann Balmelli O'Connor,* Committee for Public Counsel Services, for the siblings of Jamison.

*Margaret M. Geary* for the guardians.

*Beth M. Nussbaum* for Jamison.

*Lynne M. Murphy* for Department of Children and Families.
*Cara M. Cheyette* for the mother.

LENK, J. We are called upon in this case to decide, first, whether the Juvenile Court has subject matter jurisdiction over petitions for sibling visitation pursuant to G. L. c. 119, § 26B (*b*), where the petitioning child is in State custody and his siblings are wards in the custody of legal guardians, and, second, whether the presumption of validity afforded parental decisions regarding grandparent visitation pursuant to G. L. c. 119, § 39D, recognized in *Blixt* v. *Blixt*, 437 Mass. 649, 657-658 (2002), cert. denied, 537 U.S. 1189 (2003) (*Blixt*), applies also to the decisions of fit guardians regarding sibling visitation. Finally, we must decide whether the judge abused his discretion when mandating the visitation sought by the petitioning sibling.

In October, 2005, nine year old Jamison and three of his siblings — Christopher, then fifteen; Fergus, then five; and Rosalie, then four — became the wards of their maternal aunt, Darlene, and her spouse, Dorothy (guardians).[1] The guardians voluntarily terminated their guardianship of Jamison in October, 2007, and, in April, 2008, he was placed in the permanent custody of the Department of Children and Families (DCF).[2] In April, 2011, Jamison petitioned the Juvenile Court for visitation with Fergus and Rosalie pursuant to G. L. c. 119, § 26B (*b*). After finding that visitation would be in the best interests of all three children, a Juvenile Court judge ordered supervised visitation four times a year, over the guardians' objection. The guardians and wards appealed to the Appeals Court; we transferred the case to this court on our own motion.

We conclude that the Juvenile Court has jurisdiction over a sibling visitation petition where the petitioning child is in DCF custody and his siblings are wards subject to guardianship, and that the *Blixt* presumption does not extend to the judgments of fit guardians in such circumstances. However, since we conclude that, here, there was insufficient information to inform the judge's determination whether visitation would serve the best

---

[1] We refer to Jamison and his minor siblings by pseudonyms, and to his adult siblings and the guardians by their first names.

[2] The Department of Children and Families was known as the Department of Social Services until 2008. See St. 2008, c. 176.

interests of all three children, we remand for further proceedings.

1. *Background and prior proceedings.* Reserving some facts for later discussion, we recite the following from the judge's findings, made after an evidentiary hearing at which Christopher, Jamison, Jamison's social worker, and one of the guardians[3] testified. We supplement these facts with uncontroverted statements in the transcript and with information contained in the redacted report of the guardian ad litem (GAL), which was admitted in evidence at the hearing.

Jamison and his five siblings had a difficult childhood due to substance abuse by and domestic violence between their biological parents; DCF became involved with Jamison's family when he was an infant. For several years, Jamison often spent weekends visiting the home of his maternal aunt and her spouse, and generally enjoyed these visits in contrast to his home life. In 2005, DCF indicated to Jamison's father that the children would be placed in foster care if other arrangements were not made for them. Christopher, Jamison, Fergus, and Rosalie[4] were sent to live with Jamison's maternal aunt, her spouse, and the couple's young son, Hindley.[5] On October 25, 2005, pursuant to a decree of the Probate and Family Court, the aunt and her spouse became the guardians of the four siblings; the biological parents, whose parental rights were not terminated, assented to the guardianship.

Jamison's relationship with the guardians thereafter grew strained; he exhibited behavioral issues that the guardians attempted to address. Between 2006 and 2007, he was hospitalized twice for emotional issues.[6] Following the second hospitalization, Jamison alleged that his aunt had harmed him physically. As a result of these allegations, on September 27, 2007, DCF removed Jamison and his siblings from the guardians' custody, and Hindley from his parents' care, and then filed an emergency care and protection petition on behalf of the five children in the Juvenile

[3]The maternal aunt's spouse testified; the aunt and the two wards were not present and did not testify.

[4]The children's maternal grandmother assumed guardianship of Matthew, Jamison's older brother; and Rachael, his older sister.

[5]A pseudonym.

[6]Jamison testified that he has attention deficit hyperactivity disorder and depression.

Court. A Juvenile Court judge granted temporary custody of the children to DCF.[7]

Three weeks after their removal, all of the children except Jamison were returned to the guardians' custody. Jamison was hospitalized, and he remained in DCF custody. In April, 2008, Jamison was committed to the permanent custody of DCF. Since that time, he has been in foster care and has not seen the guardians, Christopher, Fergus, or Rosalie.[8] Jamison does not wish to see the guardians, who voluntarily terminated their guardianship of him on April 11, 2008, and they have not attempted to visit, contact, or learn about him.[9] Toward the end of 2008, after Fergus and Rosalie exhibited symptoms of trauma, a Probate and Family Court judge allowed the guardians' motion to terminate court-ordered visitation between Fergus, Rosalie, and their biological parents, and ruled that future visits were permissible solely at the guardians' discretion.[10] He also recommended that the guardians "strongly consider [both] full mental health evaluations for [Fergus and Rosalie]" and "contact between [Fergus and Rosalie] and their siblings."

On April 15, 2011, Jamison filed a motion for sibling visitation pursuant to G. L. c. 119, § 26B (b), in the Juvenile Court. Jamison's mother assented to this motion, and DCF supported it. In June, the judge determined that the Juvenile Court had

---

[7]The guardians disputed what they maintained were Jamison's false allegations of abuse, which triggered an investigation into possible felony charges and led to the aunt's four-month temporary suspension from her job.

[8]After a period without contact, Jamison renewed his relationships with his mother, Matthew, and Rachael, and now sees his mother weekly. Preliminary efforts were undertaken to have Jamison begin visits with his father, but through no fault of Jamison's, those efforts were not successful, and Jamison has no involvement with his father.

[9]Christopher remained a ward of the guardians, whom he views as his parents, until he attained the age of eighteen, and continues to maintain a close relationship with them, as well as with Fergus and Rosalie.

[10]The Probate and Family Court judge found that all six children "ha[d] been traumatized by" the parents' "domestic violence history," the mother's substance abuse problems, and the father's "having dropped out or disappeared from the children's lives." The children "continue[d] to have adverse reactions" to any discussion of visitation with their parents; these reactions include Rosalie's night terrors, bed-wetting, and adversarial behavior toward Fergus, and Fergus's increased sensitivity and tendency to be "overly tearful and clingy."

jurisdiction over Jamison's petition, and ordered that counsel be appointed for Fergus and Rosalie.[11] In September, the judge ordered that a GAL be appointed for Fergus and Rosalie. In February, 2012, the guardians unsuccessfully sought dismissal of Jamison's motion. Thereafter, the siblings filed a petition for relief pursuant to G. L. c. 211, § 3, through the guardians; a single justice of the county court denied this petition.

At the subsequent evidentiary hearing in the Juvenile Court to determine whether sibling visitation would be "reasonable, practical, and in the best interests of the child[ren]," G. L. c. 119, § 26B (*b*), there was evidence that the then sixteen year old Jamison had exhibited no behavioral issues since 2009, and was "doing well" as a student in the tenth grade. He had seen a therapist for three and one-half years and "speaks thoughtfully" about his prior behavior. Jamison testified[12] that he sought sibling visitation because "family has become a lot more important to [him]" and "nothing will ever stop that bond." Jamison's social worker testified that she was supportive of the visitation, and that he had long desired such visitation. DCF's attorney also represented that DCF was supportive of Jamison's motion.

There was also testimony that the proposed visitation might disserve Fergus and Rosalie. Dorothy testified that she opposed visitation between the wards and Jamison until the wards were older, consistent with her opposition to contact between the wards and nearly all members of Darlene's family. Dorothy was concerned that visitation would be "inappropriate and possibly harmful" to the wards, "disruptive to their typical day-to-day behavior," and "detrimental to their social relationships."[13] The GAL report indicated also that Darlene was concerned that

---

[11]When counsel became aware in October, 2011, that Rosalie had expressed a desire to visit Jamison, counsel for the two wards withdrew as to Rosalie, and new counsel was appointed for her.

[12]Jamison testified in an interview with the judge during a closed session. All counsel were then provided recordings of his testimony from which they were permitted to submit further questions for the judge to pose to Jamison. Due to Jamison's age and the judge's concern about the potentially adverse impact upon him were he to hear the anticipated testimony of Christopher and the coguardian (Dorothy), Jamison, over his objection, was not present during that testimony.

[13]Dorothy testified that she was concerned in part based on her past experiences with Jamison and in part based on Fergus's behavior after a recent

visitation would exacerbate the siblings' attention deficit hyper-activity disorder (ADHD), trigger Rosalie's night terrors, and ag-gravate Fergus's learning disorder.[14] At the time of the hearing, neither Fergus nor Rosalie wanted to visit Jamison, although Rosalie's opinion regarding visitation had changed several times. There was no expert testimony regarding the impact that visita-tion might have on Fergus and Rosalie.[15,16]

The judge found that visitation would serve the best interests of all three children. While acknowledging that "[Fergus] and [Rosalie] oppose[d] contact with [Jamison]," he noted that their brother Christopher and their guardian Dorothy both "blame [Jamison]" for the temporary removal of Fergus, Rosalie, and Hindley in 2007, and that the guardians refuse to allow contact between Fergus and Rosalie and any member of their extended maternal family. The judge deemed the guardians' determina-tion to "make decisions about [Jamison] and contact with [Jami-son]" based on his behavior "five years in [the] past" "mani-festly unreasonable." He stated in his decision, "Without any specific reason to believe that [Fergus] and [Rosalie] would be harmed by structured, supervised contact with [Jamison] and

football game at which he inadvertently had encountered his older sister Rachael. He became "tearful" and "clingy" and "wanted to be reassured."

[14]While it is unclear whether the Probate and Family Court judge's 2008 decision terminating parental visitation was before the Juvenile Court judge at the evidentiary hearing, the entirety of that decision, describing the wards' symptoms of trauma, was summarized in the unredacted portion of the guard-ian ad litem (GAL) report entered in evidence.

[15]The GAL was unavailable to testify at trial for personal reasons. As a result, rather than continue the hearing for several months until the GAL became available, the judge allowed the guardians' motion to redact the GAL's report, deleting, among other things, her recommendations and conclusions. See *Adoption of Georgia*, 433 Mass. 62, 68-69 (2000) (GAL reports may contain hearsay if GAL available to testify at trial and source of material is identifiable such that affected party may rebut).

[16]For approximately one year after Jamison filed his motion, the guardians declined to permit court-appointed counsel access to Rosalie, despite counsels' motions to compel access and for contempt. At the time of the evidentiary hearing, Rosalie's counsel stated that she had had access to her client, in total, for slightly more than one hour; the judge allowed counsel's motion for ac-cess during a particular, scheduled interview. The guardians also filed success-ful oppositions to each of the siblings' counsels' motions to obtain psychologi-cal evaluations of Fergus and Rosalie, including one made by Rosalie's counsel at the evidentiary hearing. See part 2.b.ii, *infra*.

that it would not be in their best interests, with a belief that sibling contact is generally in children's best interests, and with reason to believe that [Jamison] is being harmed by lack of contact, and that contact would be in his best interests, the Court orders contact according to [stated] parameters."

Accordingly, the judge ordered an initial two-month period of screened written correspondence, followed by supervised, quarterly visits in a neutral setting. The judge's order stated that parties seeking to suspend visitation could petition the court at any time. The guardians and wards timely appealed and petitioned a single justice of the Appeals Court for a stay of visitation pending appeal; that petition was denied, and we transferred the case to this court on our own motion.

2. *Discussion.* The guardians and wards urge the dismissal of Jamison's petition seeking sibling visitation for three reasons. The wards maintain that the Juvenile Court lacks subject matter jurisdiction over Jamison's petition. Because G. L. c. 119, § 26B (*b*), does not, on its face, address situations in which a petitioning child in DCF custody seeks visitation with siblings who are subject to guardianship, and because the Probate and Family Court exercises exclusive jurisdiction over matters pertaining to guardianships that it has established,[17] the wards argue that the judge should have declined to consider Jamison's petition.

Assuming the Juvenile Court does have jurisdiction, the guardians argue that the judge erred in declining to apply the *Blixt* presumption of validity to the guardians' judgments about sibling visitation; they contend that since guardians "have the powers and responsibilities of a parent," see G. L. c. 190B, § 5-209 (*a*), their views merit the constitutional deference afforded legal parents. Accordingly, they argue, Jamison should have been required to demonstrate that a denial of visitation would harm the wards. The wards contend also that, while there was ample evidence that visitation was in Jamison's best interests, the judge improperly disregarded or discounted evidence that visitation would harm Fergus and Rosalie. Further, the wards maintain, there was no affirmative evidence that visitation was in the

_____

[17]See G. L. c. 190B, § 1-302 (establishing Probate and Family Court jurisdiction over appointment of guardians and management of guardianships).

younger siblings' best interests, and therefore the judge abused his discretion in determining that sibling visitation was in the best interests of all three children.

a. *Juvenile Court's jurisdiction over sibling visitation.* The wards contend that the Juvenile Court lacks subject matter jurisdiction over a petition for sibling visitation, filed pursuant to G. L. c. 119, § 26B (*b*), where the petitioning child is in DCF custody and his siblings are wards subject to a guardianship established in the Probate and Family Court. Because this view of the statute disregards the Legislature's evident intent to ameliorate those situations where State intervention caused siblings to be separated, we decline to adopt such an interpretation and conclude that the Juvenile Court judge had jurisdiction to consider Jamison's petition.

When interpreting a statute, we must ascertain and implement the Legislature's intent. *International Org. of Masters, Mates & Pilots, Atl. & Gulf Region, AFL-CIO* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 392 Mass. 811, 813 (1934), citing *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). Accordingly, we begin with the plain language of the statute. *Commonwealth* v. *Raposo*, 453 Mass. 739, 743 (2009). Where the words of a statute are clear on their face, we deem them conclusive as to legislative intent, *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 839 (1986), and "simply end our analysis." *Adams* v. *Boston*, 461 Mass. 602, 609 (2012). Where ambiguities exist, however, "a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, [and] considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and that main object to be accomplished." *Commonwealth* v. *Galvin*, 388 Mass. 326, 328 (1983), quoting *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 (1975). In so doing, we read the statute as a whole, *Wolfe* v. *Gormally*, 440 Mass. 699, 704 (2004), quoting 2A N.J. Singer, Sutherland Statutory Construction § 46.05, at 154 (6th ed. rev. 2000), to ensure a harmonious interpretation. *Pentucket Manor Chronic Hosp., Inc.* v. *Rate Setting Comm'n*, 394 Mass. 233, 240 (1985), citing *Board of Educ.* v. *Assessor of Worcester, supra* at 513-514.

We have not had occasion to construe the third-party visitation statute, G. L. c. 119, § 26B, which authorizes both the Juvenile Court and the Probate and Family Court to order third-party visitation in certain circumstances. General Laws c. 119, § 26B (*a*), governs grandparent visitation where grandchildren are subject to care and protection proceedings or in DCF care,[18] while G. L. c. 119, § 26B (*b*), addresses visitation between siblings whose placements have separated them from each other. Originally enacted in 1993 and expanded in 1997, see St. 1993, c. 486, § 3, and St. 1997, c. 43, § 99, the third-party visitation provisions in G. L. c. 119, § 26, were replaced in 2008 by G. L. c. 119, § 26B.[19] See St. 2008, c. 176, § 84 ("An Act protecting children in the care of the Commonwealth").

At issue here are paragraphs one and six of G. L. c. 119, § 26B (*b*). Paragraph one states that the Juvenile Court

> "shall, whenever reasonable and practical and based on a determination of the best interests of the child, ensure that children placed in foster care shall have access to and visitation with siblings in other foster or pre-adoptive homes or in the homes of parents or extended family members . . . or after such placements, if the children or their siblings are separated through adoption or long-term or short-term placements in foster care."[20]

This paragraph plainly provides for sibling visitation where both the petitioning child and his siblings are in DCF "placements." Just as plainly, there is no provision that visitation be available where the petitioning child and the siblings from

---

[18]Massachusetts has two grandparent visitation statutes. One is codified at G. L. c. 119, § 26B (*a*); the other is codified at G. L. c. 119, § 39D. *Blixt* v. *Blixt*, 437 Mass. 649, 650-651 (2002), cert. denied, 537 U.S. 1189 (2003) (*Blixt*), addresses the latter provision.

[19]The two sibling visitation provisions are functionally identical. See *Adoption of Zander*, 83 Mass. App. Ct. 363, 367 (2013).

[20]While G. L. c. 119, § 26B (*b*), states that the court shall determine "the best interests of the *child*," the statute read as a whole requires that the court consider not only the best interests of the petitioning child but also the best interests of the minor siblings with whom visitation is sought. See *Adoption of Galvin*, 55 Mass. App. Ct. 912, 913 (2002) (G. L. c. 119, § 26B [*b*], requires judge to "consider . . . the best interests of the children in question"). See also *Adoption of Pierce*, 58 Mass. App. Ct. 342, 350 (2003).

whom he is separated are not, and have never been, in State care; the language refers specifically to "children placed in foster care." Paragraph six also indicates that placements in adoptive or foster care other than where the petitioning child resides would meet the preliminary conditions for any contemplated visitation. See G. L. c. 119, § 26B (b) ("Any child over 12 years of age may request visitation with siblings who have been separated and placed in care or have been adopted in a foster or adoptive home other than where the child resides"). However, the statute's language is far less clear when it comes to hybrid situations like the one now before us, where only the petitioning child is in State custody, or where that child's siblings are living with persons who are neither foster nor adoptive parents.

Such ambiguity prompts an examination of the statute as a whole to determine the "cause of its enactment." See *Galvin*, *supra* at 328. Both the grandparent visitation provision, G. L. c. 119, § 26B (a), and the sibling visitation provision, G. L. c. 119, § 26B (b), condition eligibility for court-ordered visitation on some form of intervention by the Commonwealth in the child's family. A court may consider grandparent visitation only where a "child is placed in family foster care," G. L. c. 119, § 26B (a), and a grandparent may seek visitation only if a grandchild is "in [DCF's] care or is the subject of a petition under [G. L. c. 119]." *Id.* Similarly, a court may consider sibling visitation only for "children placed in foster care," G. L. c. 119, § 26B (b), first par., and is obliged to construct a visitation schedule "at the time of the initial placements wherein children and their siblings are separated," G. L. c. 119, § 26B (b), second par. Neither the sibling nor the grandparent visitation section provides for visitation absent any involvement by the Commonwealth, and G. L. c. 119, § 26B (b), refers repeatedly to State "placements."

The emphasis G. L. c. 119, § 26B, places on State involvement indicates that the Legislature intended that sibling visitation be available where intervention by the Commonwealth has precipitated the separation of those siblings. See Seifert, Sibling Visitation After Adoption: The Implications of the Massachusetts Sibling Visitation Statute, 84 B.U. L. Rev. 1467, 1476 (2004).

Whether a court has jurisdiction in particular cases brought under G. L. c. 119, § 26B (*b*), will thus turn on whether, by virtue of State intervention, siblings were placed in different homes and thereby separated from one another, and not on whether, at the time a child petitions for visitation, siblings are in particular types of custodial arrangements.

To be sure, G. L. c. 119, § 26B (*b*), expressly enumerates certain custody scenarios in which sibling visitation is available: specifically, where siblings are placed in foster care, preadoptive care, and, in certain circumstances, with parents or extended family members. This does not mean, however, that sibling visitation may be ordered only in those enumerated circumstances; we will not construe the inclusion of certain statutory elements as the implied exclusion of others if doing so would frustrate the goals of the legislation. See *Halebian* v. *Berv*, 457 Mass. 620, 628 (2010), quoting 2A N.J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 47.25, at 249 (7th ed. 2007) (maxim expressio unius est exclusio alterius should be disregarded where its application would contravene legislative intent "made apparent by the entire act"); *Suffolk Constr. Co.* v. *Division of Capital Asset Mgt.*, 449 Mass. 444, 458-459 & n.19 (2007), and cases cited (maxim does not apply where its application would lead to illogical results).

The evident purpose of the sibling visitation statute is best understood by viewing the enumerated custodial arrangements as illustrative rather than exhaustive. For instance, the statute does not, on its face, explicitly authorize a child in State care to petition for visitation with siblings who have never entered DCF custody but instead remained in the custody of their biological parents. Nor does the statute expressly address the situation of siblings separated due to State placements in different guardianship arrangements. Yet, in both of these scenarios, State intervention caused the siblings to be separated. To interpret the statute as permitting visitation only where siblings are in foster or adoptive care would lead to an absurd result that the Legislature did not intend. See 2A N.J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction, *supra* at § 45:12, at 101. See also *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001).

Accordingly, we understand the Legislature's enumeration of

certain custody arrangements not as a comprehensive list, but rather as an allusion to a "general class, some of whose particular instances are those specified." See *Helvering* v. *Morgan's, Inc.*, 293 U.S. 121, 125 n.1 (1934). Jamison's situation, wherein a child in DCF care petitions to visit siblings who are subject to guardianship, falls within this class, because Jamison was separated from his siblings due to State intervention. Thus, the Juvenile Court has jurisdiction over Jamison's petition,[21] notwithstanding that G. L. c. 119, § 26B (*b*), does not explicitly address those situations where a petitioning child in DCF custody seeks visitation with siblings who are wards of the same or different guardians.[22]

b. *Abuse of discretion.* The guardians and wards argue that the judge abused his discretion in granting Jamison's motion for sibling visitation. The guardians contend that he erred as a matter of law in declining to afford the guardians' views about visitation the *Blixt* presumption of validity and, as a result, in not requiring Jamison to demonstrate that a denial of visitation would harm Fergus and Rosalie. The guardians maintain also that, in any event, the record does not support the judge's determination that visitation would serve the best interests of all three children.

Recognizing a trial judge's opportunity to evaluate witness testimony and weigh the evidence, we review a trial judge's findings with substantial deference and will not disturb the findings of a Juvenile Court judge entered after an evidentiary hearing unless the judge committed a clear error of law or an abuse of discretion. See *Adoption of Hugo*, 428 Mass. 219, 225

[21]Construing the statute in this way is well within the constitutional boundaries established by the United States Supreme Court in *Troxel* v. *Granville*, 530 U.S. 57, 67, 68 (2000) (statute providing that "[a]ny person may petition the court for visitation rights at any time" is unconstitutional).

[22]We acknowledge that, alternatively, Jamison could have petitioned the Probate and Family Court to amend the guardianship so as to prohibit the guardians from barring his efforts to see Fergus and Rosalie. However, that Jamison could have proceeded in the Probate and Family Court does not mean that the Probate and Family Court exercises exclusive jurisdiction over petitions to visit siblings under guardianship. Such a result would thwart the Legislature's intent that sibling visitation be available for children separated due to State intervention. See *Assessors of Newton* v. *Pickwick Ltd.*, 351 Mass. 621, 625 (1967), and cases cited.

(1998), cert. denied sub nom. *Hugo P.* v. *George P.*, 526 U.S. 1034 (1999). In considering whether there was an abuse of discretion, "the question is not whether we should take a different view of the evidence or should have made an opposite decision from that made by the trial judge." *Davis* v. *Boston Elevated Ry. Co.*, 235 Mass. 482, 502 (1920). Nonetheless, in reaching a decision as to a child's best interests, a judge "must have sufficient evidence to make an appropriate determination." *Adoption of Cadence*, 81 Mass. App. Ct. 162, 173 (2012). Where there is insufficient evidence to support a finding, making a determination based on that finding is an abuse of discretion. *Id.* at 173-174. See *Adoption of Leland*, 65 Mass. App. Ct. 580, 583-586 (2006), and cases cited.

i. Blixt *presumption.* We consider first whether the presumption of validity afforded parental judgments as to the best interests of their children with respect to grandparent visitation applies to legal guardians with respect to sibling visitation. We conclude that it does not.

In *Blixt*, *supra* at 658, we construed the grandparent visitation statute, G. L. c. 119, § 39D, as requiring grandparents who wish visitation with their grandchildren, over the objection of the children's parents, to rebut a presumption that parental decisions concerning visitation are valid and in the best interests of the child. The grandparent visitation statute provides that

> "[i]f the parents of an unmarried minor child are divorced, married but living apart, under a temporary order or judgment of separate support, or if either or both parents are deceased, or if said unmarried minor child was born out of wedlock whose paternity has been adjudicated by a court of competent jurisdiction or whose father has signed an acknowledgement of paternity, and the parents do not reside together, the grandparents of such minor child may be granted reasonable visitation rights to the minor child during his minority by the probate and family court department of the trial court upon a written finding that such visitation rights would be in the best interest of said minor child . . . ."

The plaintiff mother in *Blixt*, *supra* at 651, argued that the

statute on its face violated her substantive due process rights under the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. Since the statute infringed on parents' fundamental right to make decisions concerning the upbringing and care of their children, the mother maintained that it contravened both the Federal and State Constitutions. *Blixt, supra.*

Noting that the best interests of the child standard, "left unspecified, cannot survive a due process challenge," we applied principles of statutory construction "to render [the statute] constitutional," *id.* at 657, and held that parental decisions about the propriety of visitation must be afforded a presumption of validity. *Id.* at 657-658. To rebut this presumption, a grandparent seeking visitation with a grandchild must demonstrate, by a preponderance of the credible evidence, that a denial of visitation will cause the grandchild significant harm. *Id.* at 658. This requirement is founded on the historical recognition that fit parents act in the best interests of their children. *Sharon* v. *Newton*, 437 Mass. 99, 108 (2002), and cases cited. See *Troxel* v. *Granville*, 530 U.S. 57, 63-64, 68-69 (2000) (discussing grandparent visitation statutes and invalidating Washington State third-party visitation statute under Federal due process clause because it encroached too far on constitutional rights of parents to make decisions concerning rearing of their children).

Even assuming, without deciding, that the *Blixt* presumption has application outside of G. L. c. 119, § 39D, proceedings, the guardians and wards in any event fail to acknowledge the unique importance long afforded to parenthood. The constitutional rights of parents in their relationships with their children have been recognized consistently in both State and Federal law. See *Pierce* v. *Society of Sisters*, 268 U.S. 510, 534-535 (1925) ("The child is not the mere creature of the State; those who nurture him . . . have the right, coupled with the high duty, to recognize and prepare him for additional obligations"); *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1, 3 (1979) ("The interest of parents in their relationship with their children has been deemed fundamental, and is constitutionally protected"). Such parental rights have been described as being among the "essential" and "basic civil rights of man." *Stanley* v. *Illinois*,

405 U.S. 645, 651 (1972), quoting *Meyer* v. *Nebraska*, 262 U.S. 390, 399 (1923), and *Skinner* v. *Oklahoma*, 316 U.S. 535, 541 (1942).

Guardianships, by contrast, are solely creatures of statute. See G. L. c. 190B, § 1-302 (granting Probate and Family Court jurisdiction over appointment and management of guardians). As such, they may be limited in scope or revoked entirely. See G. L. c. 190B, § 5-204 (*c*) (court may replace appointed guardian); G. L. c. 190B, § 5-212 (*a*) (any interested person over fourteen may petition to remove guardian); G. L. c. 190B, § 5-207 (*b*) (any interested party may petition to limit guardian's power). Although guardians are statutorily granted "the powers and responsibilities of a parent," such powers and responsibilities are conferred subject to statutory conditions. See G. L. c. 190B, § 5-209 (*a*). A guardianship is neither the equivalent of nor coextensive with parenthood, whether the latter arises by virtue of birth or adoption.

Moreover, that adoptive parents are entitled to the *Blixt* presumption in G. L. c. 119, § 39D, proceedings does not advance the position of the guardians and wards.[23] See *Adoption of Ilona*, 459 Mass. 53, 64 (2011). Although adoption proceedings are also governed by statute, see G. L. c. 210, §§ 3, 6, the presumption applies because an adoption terminates the legal relationship between a biological parent and a child and establishes in its stead a new legal relationship between an adoptive parent and child. See *id.* (all parental rights and duties terminate upon adoption). A guardianship, on the other hand, neither abolishes the parent-child relationship nor eviscerates parental rights. See *Bezio* v. *Patenaude*, 381 Mass. 563, 576 n.9 (1980). While adoptive parents step fully into the shoes of the biological parent, guardianships are always subject to third-party limitations.

---

[23]Nor, contrary to the guardians' argument, do *Prince* v. *Massachusetts*, 321 U.S. 158 (1944), and *Pierce* v. *Society of Sisters*, 268 U.S. 510, 534-535 (1925), justify the extension of the *Blixt* presumption. While those cases shed light on the nature of the constitutional right to parent one's children, they did not recognize constitutional rights in guardians to control the upbringing of their wards. In *Prince* v. *Massachusetts, supra* at 160, 170, the United States Supreme Court held only that States' parens patriae authority may justify child labor laws that encroach to some extent upon parental authority, while the Court in *Pierce* v. *Society of Sisters, supra* at 534-545, did no more than observe that parents and guardians benefit from particular overlapping rights.

See G. L. c. 190B, § 5-207 (*b*). Merely because parents and guardians share certain rights stemming from their custodial roles, it does not follow that the same presumption of validity be accorded their judgments.[24]

That being said, however, courts need not apply the *Blixt* presumption to accord due respect to the judgments of fit guardians who, charged by statute with exercising parental responsibilities, may gain unique insight into the best interests of their wards. This is particularly so where, "with the acquiescence of the [biological parents], a substantial [parent-child] relationship ha[s] developed" between a ward and his or her guardian. *Youmans* v. *Ramos*, 429 Mass. 774, 782 (1999).

ii. *Best interests of the children.* We turn to the judge's conclusion that sibling visitation was in the best interests of all three children who were subject to the visitation order. A "touchstone of this inquiry" is each child's "health, safety, [and] welfare." *Commonwealth* v. *Gonzalez*, 462 Mass. 459, 467 (2012), quoting *Blixt*, *supra* at 658. Although we accord great deference to a judge's finding that a custody order or visitation plan will serve the best interests of a child, see *Rosenberg* v. *Merida*, 428 Mass. 182, 191 (1998), we will not uphold such a finding unless "all relevant factors in determining the best interests of the child have been weighed," *Custody of Kali*, 439 Mass. 834, 845 (2003), quoting *Rosenberg* v. *Merida*, *supra*, and the "ultimate conclusion" has "a foundation in the record supported by 'ground-level facts,' " *Prenaveau* v. *Prenaveau*, 75 Mass. App. Ct. 131, 142 (2009). See *Rosenthal* v. *Maney*, 51 Mass. App. Ct. 257, 265 (2001), quoting *Freedman* v. *Freedman*, 49 Mass. App. Ct. 519, 521 (2000) ("appellate deference" to judge's determination of best interests limited where judge's findings not supported by evidence).

We note in this regard, moreover, that the "best interests of the child" standard does not establish a presumption in favor of sibling visitation. See *Adoption of Hugo*, *supra* at 231. The

---

[24]As such, the judge correctly declined to require Jamison to prove that a denial of visitation would harm Rosalie and Fergus, and correctly required him, as a child petitioning for sibling visitation under G. L. c. 119, § 26B (*b*), to demonstrate by a fair preponderance of the evidence that visitation would serve the best interests of the three siblings in question.

standard permits visitation only where the petitioning child has demonstrated by a preponderance of the evidence that visitation would serve the best interests of each sibling subject to a visitation order. Of necessity, this individualized inquiry is fact-dependent and circumstance-specific, *id.*; *Petition of Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 593 (1981), and includes such factors as the risk of harm to any of the siblings by the proposed visitation, taking into account, inter alia, the emotional and physical health of the children, and whether any of the siblings has a history of violence or abuse. See *Gonzalez, supra* at 467; *Adoption of Hugo, supra* at 231, quoting *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 644 (1975) (best interests inquiry is "flexible" and contains "several considerations" that "vary with the circumstances"). Visitation orders should be particularized and may involve some, but not all, minor siblings. See *Petitions of Dep't of Social Servs. to Dispense with Consent to Adoption*, 20 Mass. App. Ct. 689, 697-698 (1985) (custody determinations for multiple children must be individually, not collectively, made).

Here, notwithstanding the judge's exemplary attention, care, and conduct throughout the hearing and the thoughtful order that he crafted, "the record and decision . . . contain important gaps." See *Adoption of Thea*, 78 Mass. App. Ct. 818, 823-825 (2011) (remanding for further fact finding where evidence insufficient to support finding of best interests). Because the record was insufficient to establish what impact visitation with Jamison might have on Fergus and Rosalie, the judge was unable to consider "all the relevant factors" in determining whether visitation should occur. Therefore, "the portrait . . . that emerges compels the conclusion" that further evidence was needed to determine accurately whether visitation would be in the best interests of Fergus and Rosalie. *Adoption of Irene*, 54 Mass. App. Ct. 613, 621 (2002).

Although there was sufficient evidence from both Jamison and his social worker that visitation would be in Jamison's best interests, there was little evidence specific to Fergus or Rosalie indicating that visitation would be in the best interests of either child. While Jamison "strongly desire[d]" visitation, the judge

noted that "Fergus and Rosalie oppose[d] contact with Jamison." He found that the guardians' prohibition against visitation with Jamison perpetuates the "fragment[ation]" of Fergus and Rosalie's extended family and is "manifestly unreasonable." Therefore, the judge found that, although Fergus and Rosalie had "expressed nervousness" and "some apprehension at re-encountering [Jamison]," "sibling contact is in all of the children's best interests" because "it serves [Fergus] and [Rosalie] as well as [Jamison] for them to be able to see how [Jamison] has progressed from his emotionally troubled past."

While the judge took into account the sparse information before him specifically pertaining to the younger siblings, the record was, ultimately, insufficient to provide an adequate analysis of how visitation could affect Fergus and Rosalie. The GAL report, in its redacted form, did not state whether Fergus and Rosalie had suffered from stress-induced symptoms or would likely suffer from such symptoms if visitation occurred. Rosalie's counsel stated she was "really not able to judge" how Rosalie felt; she requested that "someone . . . testify as to whether or not . . . these visits will impact [Rosalie]" and "what her psychological state is." Dorothy testified that she "can't say what [Fergus] and [Rosalie] would feel" if visitation occurred. Nor could Jamison's social worker address how Fergus and Rosalie would respond to seeing Jamison; she testified, "I've never met [Fergus and Rosalie], so I wouldn't be able to answer that [question]."

In addition to this absence of direct evidence on the likely impact of visitation, there were indications in the record that visitation might be harmful to Fergus and Rosalie, who the evidence suggests may have emotional difficulties or mental health issues and who, at the time of the hearing, did not want to visit Jamison. *Adoption of Nancy*, 443 Mass. 512, 518 (2005), quoting *Care & Protection of Georgette*, 439 Mass. 28, 36 (2003) (wishes of children "entitled to weight" in determining best interests). In 2008, a Probate and Family Court judge found that Fergus and Rosalie "ha[d] been traumatized by their [biological] parents." He allowed the guardians' motion that visitation with the parents occur solely at the discretion of the guardians, and found it "unsurprising that the children continue to

have adverse reactions" that were "exacerbated and increased" by visitation with their parents. These reactions were sufficiently troubling that the judge recommended "full mental health evaluations for the children," instructing the guardians to "then follow recommendations which may be made" so as to "fully and properly address the emotional state of [Rosalie] and [Fergus]."[25]

Christopher and one of the guardians testified as to the reasons they believed that visitation with Jamison might harm the younger siblings.[26] Dorothy testified that she believed visitation with Jamison would "allow[] a past extremely traumatic event to recur in their life," and that visitation at this point in their lives might frighten Fergus and Rosalie and make them feel unsafe.[27] Darlene told the GAL of their concern that visitation might worsen the siblings' ADHD, trigger Rosalie's bed-wetting and night terrors,[28] and increase Fergus' emotional anxiety. According to Christopher, Fergus and Rosalie had witnessed Jamison engage in various self-injurious behaviors, which occurred with some frequency during 2006 and 2007. Fergus also told the GAL that Jamison had once held a magnifying glass to Fergus's shirt until it burned a hole in it.

[25]It is unclear from the record whether such evaluations or any subsequent counseling took place. The maternal aunt told the GAL that she had tried to procure counselling for Fergus and Rosalie, but that she could not afford it; Christopher testified at the hearing, however, that he, Fergus, and Rosalie had undergone therapy since their removal, although he did not know the date Fergus and Rosalie had last been in therapy. Nothing in the record suggests that the guardians implemented the recommendation by the Probate and Family Court judge in 2008 that Fergus and Rosalie receive "full mental health evaluations."

[26]Both Christopher and the coguardian testified, however, that they neither had nor wanted current information as to Jamison's condition. Their views as to Jamison, with whom they had last interacted when he was eleven years old, were based solely upon his prior behavior. Christopher testified that he did not "want to take that chance" to reconnect with Jamison "[d]espite not knowing what [Jamison's] emotional state is currently"; Dorothy was "not looking for" documentation that Jamison is emotionally stable, although she testified that such information would make a difference in her views concerning visitation.

[27]See note 13, *supra*.

[28]Christopher testified that, at night, Fergus and Rosalie "scream out. . . [and] kick the walls," saying, "I don't want to go, I don't want to see him, don't let me leave."

None of the parties presented expert testimony on the psychological condition of Fergus or Rosalie (or, for that matter, Jamison) and the likely impact of visitation on any of the children's well-being.[29] The investigative GAL,[30] whose report included observations about and statements from the wards, see *Pizzino* v. *Miller*, 67 Mass. App. Ct. 865, 876 (2006), was not in a position to render expert judgments or analyze data gleaned from clinical testing.[31] In any event, her recommendations and conclusions regarding visitation were excluded based on the guardians' motion. In March, 2012, the guardians filed an opposition to a motion for psychological evaluations of Fergus and Rosalie, and no action was taken on that motion. Although counsel for Rosalie subsequently requested psychological evaluations of her client, including at the hearing in July, 2012,[32] such evaluations were opposed by the guardians, and the judge declined to order them.

Whether the guardians' attempts to minimize contact between Rosalie and her lawyer, to block any proposed psychological evaluation of the wards, and to resist contact between members of their household and the wards' siblings and extended maternal family are viewed as protective of the wards or as misguided

[29]An expert who had not interviewed Fergus or Rosalie was scheduled to testify but was excused from service after the attorneys "reread[] the records" and found "there was nothing that was relevant" in the expert's proposed testimony.

[30]An editorial note accompanying S.J.C. Rule 1:07, as amended, 431 Mass. 1301 (2000), "Fee Generating Appointments and the Maintenance of Appointment Dockets in All Courts," divides guardians ad litem into two categories. Category E governs "guardians ad litem/evaluators," while Category F governs "guardians ad litem/investigators." Whereas evaluative GALs develop clinical opinions that assist a judge in making custody or visitation decisions, investigative GALs submit the factual data in proceedings regarding custody and visitation but do not formulate clinical judgments. See Probate and Family Court Standing Order 1-08 (2008) (governing Category E GALs); Probate and Family Court Standing Order 1-05 (2005) (establishing standards for Category F GALs).

[31]See Probate and Family Court Standing Order 1-05, Standard 1.1.A for Category F Guardians Ad Litem/Investigators (investigative GALs may not perform clinical assessments and may only provide descriptive information).

[32]Counsel stated, "[Rosalie] has no therapist. She's ten years old . . . . I don't want to put her on the stand. I think that the best way to bring forward her opinion is to have an expert testify about it . . . . I can't testify to that. She's not going to testify to that."

intransigence, the question before the judge was if the requested visitation would be in Rosalie's and Fergus's best interests. As to that question, the guardians pointed to the same manifestations of fragility in Fergus and Rosalie, not readily reducible to "nervousness" or "apprehension," that the Probate and Family Court judge noted with concern in 2008. Whether such fragility persisted, and the likely impact of the proposed visitation on the well being of Fergus and Rosalie, were proper subjects for expert opinion, and the judge need not and should not have made his decision without it.

The dearth of expert or pertinent lay testimony also obscured how the best interests of Fergus and Rosalie might differ. The record indicates that Fergus and Rosalie had particularized psychological difficulties and different perspectives regarding visitation. The GAL report states that, while Fergus and Rosalie both suffer from ADHD, only Rosalie suffers from bed-wetting, and only Fergus has a learning disability requiring an individualized education plan and grows tearful when anxious. Moreover, the siblings have expressed distinct feelings about Jamison. Although Rosalie, who was four years old when Jamison departed the guardians' household, thinks about Jamison sometimes, believes he "probably turned out better," and has expressed periodic interest in visitation, Fergus, who was five years old when he last saw Jamison, is fearful of Jamison's past behavior and would not like to see him even if he has improved. In the face of such contrasting evidence, and absent any recommendations or conclusions by the GAL, expert psychological testimony would have illuminated each child's individual needs. See *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 20 Mass. App. Ct. 689, 697 (1986), quoting *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 16 Mass. App. Ct. 607, 610 (1983), *S.C.*, 391 Mass. 113 (1984) (judge's determination regarding best interests must be "in relation to [each] *particular* child").

The judge's careful consideration of the limited information before him could not compensate for the guardians' unwillingness to make Fergus and Rosalie available to counsel, their opposition to psychological evaluations, the lack of expert testimony concerning the impact of any type of visitation, and the absence

of evidence that visitation would serve the best interests of Fergus and Rosalie. Further evidence was needed to determine whether visitation was in the best interests of all three children subject to the order, not just Jamison. Accordingly, on remand, the judge should require that such psychological evaluations of Fergus and Rosalie as necessary and appropriate to an assessment of the impact upon these wards of the requested sibling visitation be performed, and that expert evidence in that regard be available to the judge, along with other evidence, when determining whether the requested visitation is in each of the wards' best interests.

3. *Conclusion.* The order allowing the motion for sibling visitation is vacated and set aside. The case is remanded to the Juvenile Court for further proceedings consistent with this opinion.

*So ordered.*