NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1350

CARE & PROTECTION OF BAILEY (and two companion cases[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a Juvenile Court judge found the mother unfit to parent her three children, adjudicated the children to be in need of care and protection, and committed them to the permanent custody of the Department of Children and Families (department).  The judge terminated the mother's parental rights as to the youngest two children and approved a plan of adoption for them in the same foster family.[2]  The judge declined to terminate the mother's parental rights as to the oldest child.  The mother and the oldest child challenge the judge's finding that the mother was unfit, as well as the judge's deferral to

_____

[1] Adoption of Riley and Adoption of Kelly.  The children's names are pseudonyms.

[2] None of the fathers appeared at trial and their parental rights were also terminated.  No father is a party to this appeal.  The two youngest children did not appeal from the decrees.

the time of trial of certain motions regarding parenting time. The oldest child also appeals the judge's posttermination and postadoption sibling visitation orders.  We affirm the decrees and the judgment finding the mother unfit to parent Bailey but remand with respect to the sibling visitation orders.

Background.  The mother moved to Massachusetts in 2014, leaving New York where she had a pending child protection case as to her first-born child alleging failure to thrive and neglect by the mother.[3]  The mother moved around from place to place, staying with friends and at shelters, working intermittently, mostly in retail and food service.  In 2016, the mother came to the attention of the department due to a G. L. c. 119, § 51A, report (51A report) alleging that she fought with another individual at a shelter in front of her children, then five years old and nine months old, respectively.  Thereafter, further 51A reports alleged the oldest child's chronic absenteeism from school, as well as various physical injuries to the oldest child, including scratches and cuts on the child's hands and cheek, a swollen hand, scratches and dried blood in

_____

[3] The mother's explanation of the New York case was that the oldest child "did not want to eat" because she had a "bad spirit."

2

the child's ear, and scratches and bite marks to the child's stomach and back.[4]

The 51A report leading to the first care and protection petition on behalf of the two oldest children came in May 2019, when the oldest child, then eight years old, was observed with two large facial marks, appearing to be burns. Further investigation revealed injuries all over the oldest child's body, including healing bite marks. The mother gave inconsistent explanations for the marks, including that the injuries were self-inflicted. Following removal from the mother, both children indicated that the mother had inflicted the injuries on the oldest child. Additionally, the oldest child disclosed that the mother would blame the oldest child for the fact that they had to live in a shelter.

In her interactions with department representatives, the mother would make threats and accuse them of conspiring against her. She completed a twelve-week parenting group but exhibited no observable changes in behavior. She continued to insist that the oldest child's injuries were self-inflicted even after being

---

[4] During the investigation that followed, the mother stated that the oldest child was "possessed." The mother also stated that, when the children were not behaving appropriately, she would threaten to "give them 'pow-pow.'" The second child (Riley) later used the same term when reporting how Bailey, the oldest child, sustained injury.

confronted with the fact that the location and nature of the injuries would have made self-infliction physically impossible.

Soon after the mother gave birth to the youngest child in December 2019, the department filed a second petition for care and protection on her behalf and obtained custody of the child.[5] Subsequently, the mother engaged in programs aimed at helping her parenting skills and mental health, but they appeared to have no effect on her behavior. The mother continued to express her belief that everyone was conspiring against her, left hostile and profanity-laden messages for department representatives, and was inappropriate in front of the children during her parenting time, including arguing with and threatening department workers and accusing the foster parents of abusing the children. She was also inappropriate with the children during parenting time, including changing the youngest child's formula against pediatrician advice, failing to comfort the middle child who was crying hysterically on the floor during a supervised visit, and repeatedly blaming the oldest child for the mother's own failings.

---

[5] Although the two petitions (the first pertaining to the older two children and the second pertaining to the youngest child) have separate dockets, they were tried together.

4

Due to the mother's inappropriate behavior during her parenting time and the deleterious effect of the visits on the children, the mother's parenting time was gradually reduced over time. When the department removed the two oldest children from the mother's care in May 2019, the mother was offered biweekly, two-hour, supervised parenting time. In July 2020, during a virtual visit with the middle child, the mother accused the foster parents of abusing the child. Thereafter, the department observed a significant change in the behavior of the child. The department reduced the mother's parenting time with the middle child to ninety minutes, twice a month.

In 2021, the middle child began to refuse visits with the mother, who became irate. There ensued a series of incidents where the mother became aggressive with staff and threatening to foster parents; she accused the oldest child of covering for the foster parents and refused to visit with any of the children if the middle child was not in attendance. Thereafter, the department reduced visits with all the children to twice a month. The middle child continued to exhibit significant negative behaviors surrounding visits with the mother. In August 2021, the mother's parenting time with the middle child was further reduced to once a month. During the visits the department representatives would remove the middle child after

5

forty-five minutes to alleviate "stressors," while the two other children were permitted to stay for the entire scheduled time.

In September 2021, the mother moved for increased parenting time, specifically requesting weekly visits with all three children.  The judge deferred ruling on the motion to the time of trial.  In October 2021, the mother filed a motion requesting the court to make a determination that the department had failed to make reasonable efforts towards reunification, specifically complaining about the limited parenting time and requesting weekly parenting time with all three children.  The oldest child joined in the mother's motion, but the middle child, as well as the department, filed oppositions.  After consideration of all submissions, the court denied the mother's motion in November 2021.

During a January 2022 visit, the mother became angry and aggressive in front of the children.  As attempts to deescalate failed, the mother was told that the visit would be ending.  The mother physically intervened as the middle child was being led away; she put both hands on a department representative, shoving her out of the way to grab the middle child, who was requesting to leave the visit.  The mother refused to leave and told the oldest child not to leave, adding that the whole thing was the fault of the oldest child.  The department then terminated in-

person parenting time and instead offered once a month virtual visits.  In March 2022, the department moved to terminate the mother's parenting time altogether.  As she had done with the mother's motion for increased parenting time, the judge deferred ruling on the motion to the time of trial.

The trial took place over twelve nonconsecutive days between April 20, 2022 and December 14, 2022.  By the conclusion of trial, the oldest child was almost twelve years old and in a therapeutic residential facility, and no adoptive resource had yet been identified.  Although the judge found the mother unfit to parent the oldest child, the mother's parental rights were not terminated as to that child.  The judge denied the mother's motion for increased parenting time but encouraged the department to reassess the situation and consider reinstituting in-person visitation between the mother and the oldest child.

The judge also found the mother unfit to parent the younger two children, terminated her parental rights as to those children, and approved the plan of adoption by their foster family.  Additionally, the judge ordered a minimum of once a year posttermination and postadoption visits between the mother and the two younger children.  The middle child's visitation with the mother was conditioned on the child requesting the visit.  The judge also ordered that the oldest child have

7

sibling visitation with the younger two children, but in consideration of the significant therapeutic issues faced by the older two children, declined to set a schedule and instead provided that any sibling visitation should be "consistent with the therapeutic needs" of the older two children.

Discussion. 1. Termination. To terminate parental rights to a child, the judge must find, by clear and convincing evidence, that the parent is unfit and that the child's "best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011). We give substantial deference to the judge's findings of fact and decision, and will reverse "only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Id.

On appeal, the mother contends that the judge's findings fall short of establishing that the mother was unfit to parent her children. In particular, she argues that because the judge made no finding that the mother bit or caused the injuries of the oldest child -- the allegations prompting the removal of the two oldest children -- "the court made no direct finding . . . about the central factual question relevant to the mother's unfitness." Relying on Care and Protection of Yetta, 84 Mass. App. Ct. 691 (2014), she claims that the findings were therefore

insufficient to demonstrate unfitness.  The comparison is inapt.
In Care and Protection of Yetta, the allegation leading to
removal was sexual abuse by the father.  See id. at 693.  The
judge found that the evidence did not establish that sexual
abuse had taken place, but concluded the children were in need
of care and protection based on the father's "loud angry tone"
and the lack of adequate parental supervision.  See id. at 691,
693-694.  This court reversed the judgment, ruling that in the
absence of sexual abuse or neglect leading to serious harm,
there was insufficient evidence to support the finding of
parental unfitness.  See id. at 697-698.

Here, by contrast, the judge found that the oldest child
indeed had been repeatedly physically abused and had sustained
"extensive" injuries all over her body and that the mother's
"grievous shortcomings" placed all the children at risk, if they
were returned to the mother's care.  As the judge recognized,
even if the mother herself had not inflicted the injuries on the
oldest child, she had failed in her duty to protect the child.
See Adoption of Yalena, 100 Mass. App. Ct. 542, 552 (2021).

The judge based her unfitness determination in this case on
a number of factors, including the mother's unacknowledged
mental health issues, which the judge found, put the children at
grave risk.  There was evidence that among other conditions, the

mother suffered from delusions that were "pervasive and

persecutory in nature."  See G. L. c. 210, § 3 (c) (xii)

(relevant factor in fitness evaluation is whether parent suffers

from mental illness that is "reasonably likely to continue for a

prolonged, indeterminate period," and that renders parent

"unlikely to provide minimally acceptable care" of children).

As the judge found, the mother's perception that everyone was

conspiring against her negatively impacted her education,

employment, and housing, leading to instability for the

children.  Additionally, her inability to control her volatile

temper and aggressive behavior, the judge concluded, negatively

impacted the children.[6]  Moreover, the judge further concluded

that the mother exhibited a lack of empathy towards the children

and concern for their welfare, as she failed to put their needs

above her own.[7]  In short, there was clear and convincing

---

[6] The mother and the oldest child contend that the judge
erred in attributing the mental health issues of the two older
children to the fact that they spent their early years in the
care of the mother, by comparing them with the youngest child,
who was separated from the mother at birth and had no apparent
mental health issues.  Although there certainly are alternative
explanations for the mental health issues experienced by the
older two children, the inference that the judge drew was
supported in the evidence.  See Custody of Eleanor, 414 Mass.
795, 799 (1993).

[7] The mother argues that the judge improperly relied on her
negative reaction to news of the middle child's exploration of

10

evidence of unfitness, even in the absence of a specific finding that the mother had inflicted physical injury on the oldest child, and the judge's subsidiary findings amply supported the judge's ultimate determination of unfitness.[8]

2. Deferred rulings on motions regarding parenting time. The mother and the oldest child both fault the judge for not

---

gender identity in order to find her unfit. The mother claims that reliance was improper in the sense that the mother was punished for failing to conform to prevailing social norms. However, the judge did not fault the mother for refusing to accept that the middle child may have been engaging in gender identity exploration; rather, the judge focused on the mother's antagonistic and explosive behavior in front of the child, demonstrating indifference to the feelings of the child. See Adoption of Ulrich, 94 Mass. App. Ct. 668, 676 (2019) (finding of unfitness supported in part by evidence that mother displayed "aggressive attitude" with counselors at number of visits).

[8] The oldest child contends that the judge erred by treating all three children "as a unit," rather than as individuals, pointing to the identical findings and rulings on the two care and protection petitions. See Guardianship of Estelle, 70 Mass. App. Ct. 575, 581 (2007) ("parent may be fit to raise one child but not another"). The findings and rulings on the two petitions are identical, because they were tried together; nevertheless, they include separate sections pertaining to each child. In fact, as to the oldest child (in contrast with the other two children), the judge specifically found that, given the child's age, interest in ongoing contact with the mother, and current lack of adoptive resource, it would not be in the child's best interest to terminate the mother's parental rights. As to the oldest child's argument that the judge ignored evidence of the mother's current fitness and instead relied on stale evidence, the findings make clear that the judge acknowledged conflicting evidence of the mother's current fitness and relied on all evidence up through the time of trial.

ruling on motions regarding parenting time until the conclusion of trial. See Adoption of Rhona, 57 Mass. App. Ct. 479, 490 (2003) (delay in acting on motions may lead to deterioration of parent-child bond and development of bond between child and foster parents, thereby prejudicing parents' positions at trial). Although the judge did defer ruling on the mother's September 2021 motion for increased parenting time, the judge promptly ruled on the mother's October 2021 reasonable efforts motion, which also requested increased parenting time. Therefore, the substance of the mother's grievance was timely addressed such that the claim of delayed decision-making is without merit. See Care and Protection of Rashida, 488 Mass. 217, 233 (2021) (substance, not label, of motion is what controls). To the extent that the deferral of motions regarding parenting time was error, it was not prejudicial as the termination of the mother's parental rights was not based on bonding issues. See Adoption of Franklin, 99 Mass. App. Ct. 787, 796-799 (2021) (father not entitled to reversal of decrees terminating his parental rights where absence of visitation played minimal role in termination of parental rights and there was overwhelming evidence of unfitness). Contrast Adoption of Rhona, supra (parents deprived of visitation during delay in ruling were prejudiced where bonding was allowed to continue to

12

deteriorate during pivotal period in judicial proceedings and department argued bonding with foster parents had occurred).

3. Sibling visitation orders. An order of sibling visitation is available, pursuant to G. L. c. 119, § 26B (b), where intervention by the Commonwealth has precipitated the separation of siblings. See Care & Protection of Jamison, 467 Mass. 269, 284-285 (2014) (discussing standard governing sibling visitation). Here, based on the judge's decrees, the oldest child was to remain separated from the younger two siblings, who were to be adopted by their foster family. The judge ordered that the oldest child would have posttermination and postadoption visitation with the two younger siblings "consistent with the therapeutic needs" of the older two siblings, who each had significant "mental health challenges."

Although an order of sibling visitation may be issued upon a finding that the visitation is in the best interests of all the children, see Care & Protection of Jamison, 467 Mass. at 284-285, if the judge orders visitation, the judge must also decide "the schedule and conditions of visitation." Adoption of Zander, 83 Mass. App. Ct. 363, 367 (2013), quoting Adoption of Rico, 72 Mass. App. Ct. 214, 220-221 (2008). Here, the judge ordered visitation, but only as "consistent with the therapeutic needs of [the older] children." Here, guided by Care and

13

Protection of Ian, 46 Mass. App. Ct. 615, 620 (1999), we conclude that the wording of the order could have the unintended result of terminating all visitation between the oldest child and other siblings.

Accordingly, the sibling visitation orders are vacated, and the cases are remanded for further proceedings on that issue. On remand the judge should reconsider the issue of sibling visitation, make a specific finding, consistent with the governing standard, regarding whether sibling visitation is in the best interests of all three children, and if so, provide an appropriate scheduling order for posttermination and postadoption sibling visitation. The decrees are otherwise affirmed. The judgment finding the mother unfit to parent Bailey is otherwise affirmed.

So ordered.

By the Court (Singh, Hand & D'Angelo, JJ.[9]),

Paul Little

Clerk

Entered: September 6, 2024.

---

[9] The panelists are listed in order of seniority.